**REVERE COPPER AND BRASS, INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 13961.

United States Court of Appeals
Seventh Circuit.

Oct. 31, 1963.

ed, (hereinafter sometimes called "Revere") filed pursuant to § 10(c) of the National Labor Relations Act, as amended, Title 29 U.S.C.A. § 151 et seq., to review an order issued by respondent, the National Labor Relations Board, on October 4, 1962, and on the Board's cross-petition for enforcement of that order.

On motion of its counsel, the International Association of Machinists (hereinafter sometimes called the "Union") was allowed to intervene in the proceedings before this Court and to file its brief as *amicus curiae*.

The Board found that Revere

"* * * by its interviews and interrogation of employees, interfered with, restrained, and coerced employees in violation of Section 8(a) (1) of the Act, and also aided, assisted, and contributed support to the Union by coercing employees into joining the Union in violation of Section 8(a) (2) of the Act. [Revere Copper and Brass, Inc. and Reuben H. Monkman and Dewitt Lodge No. 852, International Association of Machinists, Party in Interest. Case No. 13–CA–4613, October 4, 1962, 138 NLRB No. 140, pp. 1377 & 1378]"

The Board also adopted the conclusions of the Trial Examiner that:

Henry E. Seyfarth, Walter P. Loomis, Jr., Richard L. Marcus, Chicago, Ill., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel, for petitioner.

George Christensen, Washington, D. C., amicus curiae.

Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Solomon I. Hirsh, Gary Green, Attys., N. L. R. B., for respondent.

Before SCHNACKENBERG, KNOCH and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

This matter is before us on the petition of Revere Copper and Brass, Incorporat-

"4. By discriminating in regard to the hire and tenure of employment of Reuben Monkman, Respondent [Revere] engaged in unfair labor practices within the meaning of Section 8(a) (3) and (1) of the Act.

"5. By interrogating its employees, as found herein, and by discriminating against Reuben Monkman, Respondent [Revere] rendered unlawful assistance and support to a labor organization, and engaged in an unfair labor practice within the meaning of Section 8(a) (2) of the Act.

"6. The aforesaid unfair labor practices are unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act. [Ibid. p. 1392]"

The Board ordered Revere to reimburse 27 employees (with interest) for initiation fees and dues which Revere had deducted from their wages and remitted to the Union, to reinstate Reuben H. Monkman, the charging party, who had been discharged, and to pay him (with interest) for lost wages.

The Union was not found to be guilty of any unfair labor practices and was not held jointly liable with Revere for the reimbursement order.

The incidents giving rise to these proceedings occurred during the course of collective bargaining between Revere and the Union with respect to Revere's factory at Clinton, Illinois. A prior agreement which expired November 18, 1961, had contained a clause under which all prospective new employees were to join the Union, and all present employee-members were to maintain their membership as a condition of employment unless the latter took advantage of a two-week "escape period" during which they might resign from the Union. Non-members currently in Revere's employ were not required to join.

The parties agree that during the contract negotiations which began in November, 1961, the Union sought provisions requiring all employees to join the Union after thirty days.

Revere operates 19 plants. It has an established policy of not granting a union shop contract at any plant. The Union threatened to strike over this issue at the Clinton plant.

In the course of these negotiations, it was suggested to Revere that 100% membership of the 400-employee unit at the Clinton plant would eliminate the need for a full union security provision in the contract. Revere officials were given the names of their 28 non-member employees at Clinton. Although no promise of cooperation with the Union was made, the Revere officials met separately and, as Gerald H. Bush, Superintendent of the Tool Plant, testified:

"It was decided we should talk to the men and make them fully aware if there was a strike, what the circumstances would be, and to give them the opportunity of averting the strike if possible."

Harold J. Schindler, the Works Manager, testified to false rumors of Revere's opposition to the Union. He stated:

"[W]e had heard that the foreman had made remarks about not joining the union. We wanted to get that clear. There were other remarks made and rumors if they did join the union, it might jeopardize their job with Revere. And that story had gotten around Revere. So, I cleared the three points when I talked to each and everyone."

There is substantial evidence to support the findings that various Revere officials interviewed about 18 of the non-Union-member employees, usually alone, in the officials' offices. Each employee was questioned about his attitude toward Union membership, and told that his continued resistance would result in a strike. Several were told that such a strike would probably be successful and that all employees would then have to join the Union.

The first, if not the only, employee to state firmly that he refused to join the Union even if such refusal did result in a strike was Reuben Monkman, the charging party in the proceedings before the Board. He had been employed by Revere for more than seven years. He had once been not only a member but a departmental steward and "conductor" of the Union.

Several days later in conversation with Robert Karr, the Union's Shop Chairman, Mr. Monkman again refused to join. When Mr. Karr said that Mr. Monkman would then have to see Works Manager Schindler, Mr. Monkman said that he would neither join the Union nor see Mr. Schindler about it. When Edward Keenan, Revere's Assistant Works Manager, told Mr. Monkman that Mr. Schindler wanted to talk to him, Mr. Monkman replied that he had told both Union and company officials he refused to join the

Union, that he would not discuss Union business further with Mr. Schindler. When told that the summons to Mr. Schindler's office was an order, Mr. Monkman answered that he would file an unfair labor charge if he were subjected to any further efforts to recruit his membership against his will. He was further informed by an assistant foreman that Mr. Keenan said to tell him that the Works Manager wanted to talk to him. When Mr. Monkman again refused to go to Mr. Schindler's office, a suspension notice was handed to him. The assistant foreman admitted that Mr. Monkman's threat (to file charges, if forced to discuss the Union) was transmitted to Mr. Schindler. On December 1, 1961, Mr. Monkman received a letter discharging him.

There was conflict in the testimony of Mr. Monkman and Mr. Keenan as to the exact terms of the conversation between them. The Trial Examiner credited Mr. Monkman's account which he found to be direct, detailed and precise. He found Mr. Keenan's demeanor on the stand to be "vague and embarrassed."

■ While Mr. Monkman assumed that he was summoned to the office to discuss Union membership, he testified that he did not in fact "know" why he was summoned, though he had reason to believe further discussion of the Union was contemplated. Revere asserts that it was his duty to obey a lawful order to see the Works Manager without conjecture as to its purpose and that he was properly discharged for insubordination. Mr. Schindler testified that in fact he wished to interrogate Mr. Monkman about misstatements allegedly circulated by him to the effect that the Union and Revere were "making deals." It is undisputed that none of the three persons who told Mr. Monkman to go to Mr. Schindler's office told Mr. Monkman anything about alleged misstatements, or even commented on Mr. Monkman's own statements that he refused to discuss the Union further with Mr. Schindler. The Trial Examiner who heard this testimony about a lawful purpose for summoning Mr. Monkman did not believe it. It is axiomatic that questions of credibility necessarily present issues for resolution by the Trial Examiner who heard the witnesses. Revere Camera Co. v. N. L. R. B., 7 Cir., 1962, 304 F.2d 162, 164.

■ Our review of the Board's factual findings is limited to a determination of whether those findings are supported by substantial evidence in the record considered as a whole. Board findings so supported are conclusive. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456.

Revere officials continued to interview non-member employees. By December 11, all 27 had signed membership cards. A new contract was executed, without the two-week escape clause of the former contract, but with the same provision that non-member employees, of whom there were now none, might continue to be non-members.

Revere invites our attention to the fact that none of the 26 employees who testified said that he was influenced by the suspension or discharge of Mr. Monkman, and that many testified to having joined the Union voluntarily, not through force by Revere. Revere contends that none of the statements made to the employees during the interviews contained threats of reprisal or promises of benefits, but were all of the type which is permitted and protected by the U. S. Constitution, First Amendment, and by § 8(c) of the Act.

Revere also argues that the award of interest on back pay and refunds is beyond the scope of the Board's authority under § 10(c) of the Act.

Revere was clearly anxious to avoid insertion of a full union-shop clause in the contract at Clinton, because of its "opposition to forcing long-term employees into a union against their will when they faced no such requirement at their time of hire," according to a statement in Revere's brief.

■■ The Act guarantees employees complete and unfettered freedom of choice respecting a bargaining representative. The evidence adduced before the Trial Examiner and credited by him (and the Board) does support a finding that the line of conduct followed by Revere's representatives, though consisting of oral efforts to persuade their employees, exceeded the rights of free speech guaranteed an employer. Revere was not entitled to encourage membership in the Union by engaging in conduct which interfered with their employees' free and unfettered choice to join or not to join. N. L. R. B. v. Wagner Iron Works, etc., 7 Cir. 1955, 220 F.2d 126, 138, cert. den. 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850. In the interviews, Revere was not merely seeking information as to the nature of its employees' views, but was attempting to change those views. Revere must have known of the simultaneous efforts of Union officials who were allowed to caution employees that refusal to join meant further interviews with Revere officials. Although Revere officials testified that they repeatedly told the employees the choice was theirs, they also told those employees that refusal to join the Union would produce a strike. The employees were warned of the dire results of such a strike, with the likely consequence of enforced Union membership at the end of it. As Revere itself told the Board, this was "a small mill and it can be assumed that news travels fast." Reuben Monkman flatly refused to join the Union, said that it was up to Revere to resolve the problem, that if Revere agreed to a union shop he would have no alternative but to join the Union. Reuben Monkman's discharge under all the attendant circumstances must have had a coercive effect on the remaining 27 non-member employees.

There is ample support in the testimony for the Board's conclusion that the employees were put in apprehension of the impending hostility of their fellow employees, of the Union, and even of Revere. Granted that the Revere officials told their employees nothing that was not factually correct, the surrounding circumstances, the repeated pressures, were such as to justify the finding of a general pattern of action so coercive in character as to destroy freedom of action.

The Board was not required to accept at face value the testimony of certain employees that their election to join the Union was voluntary. The Board could view this expression in the light of the total picture presented by the evidence, and conclude, as it did here, that choice was constrained by the conditions and circumstances which Revere officials created.

Despite the lack of any express formal agreement to cooperate to force Union membership on the 28 hold-outs, it is difficult to imagine how the efforts of management and Union leadership might have been better coordinated to their mutually desired end of 100% Union membership. There is substantial evidence for a finding that Revere furnished illegal support to the Union in violation of Section 8(a) (2) of the Act.

■■ Having found that Revere had committed unfair labor practices, the Board entered an order designed to terminate such unfair practices and to eliminate the consequences thereof. The Board named the Union as a party in interest because Revere had been charged with unlawful assistance. When the Board denied the Union's motion that it be stricken as a party, the Union refrained from further participation in the hearing, although full opportunity for such participation was made available to the Union. In its *amicus* brief, the Union argues that the Board could not enter an order affecting its contract rights. The Board contends that the Union could have itself petitioned for review of this order, but failed to do so, choosing instead to urge in its *amicus* brief objections which it might have presented to the Board. The Board argues further that the Union is thus precluded from seeking consideration of these same objections in this Court. We need not reach that question as a Board order, directed at a party found to have commit-

ted unfair labor practices, is not rendered invalid because it incidentally affects others not charged with commission of illegal acts. As the Board notes, innocent third parties are affected when replacements are discharged or demoted to reinstate unlawfully discharged or passed-over employees. The Board was required to give the Union notice of the issues and an opportunity to be heard. Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 231–239, 59 S.Ct. 206, 83 L.Ed. 126. That was done here.

■ To remove the consequences of the violations of the Act, the 27 employees must be given an opportunity to resign from the Union if they wish to do so, and it is only proper in that case, that Revere reimburse them for dues and fees paid to the Union.

■ As indicated above, Revere contends that, as a matter of law, the Board exceeded the limits of its powers under Section 10(c) of the Act by awarding interest on back pay and other monies ordered to be reimbursed. In Isis Plumbing & Heating Co., 138 N.L.R.B. 97, p. 716, the Board decided, in order to undo the effects of violations of the Act, to add interest at the rate of 6% per annum to back pay awards. In Seafarers International Union, 138 N.L.R.B. No. 130, p. 1142, it was decided to add similar interest to unlawfully exacted dues, etc., ordered to be reimbursed. Two circuits have considered and approved the power of the Board to award such interest. International Brotherhood of Operative Potters, A.F.L.-C.I.O. v. N. L. R. B., 1963, 116 U.S.App.D.C. ——, 320 F.2d 757, 47 L C (CCH) ¶ 18,310; Reserve Supply Corp. v. N. L. R. B., 2 Cir., 1963, 317 F.2d 785, 789. We find these cases persuasive. As the Court said in the Operative Potters case, the Board did not forfeit its authority by a contrary policy in the past. "In the evolution of the law of remedies some things are bound to happen for the 'first time.' * * *"

We have considered all other points and arguments advanced by the parties with care, but deem it unnecessary to comment on each. We are satisfied that the Board's Order is entitled to enforcement, and that the petition to review it must be denied.

Enforcement ordered.