418 F.2d 346
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CHICAGO ROLL FORMING CORPORATION, and Machinery, Scrap Iron, Metal and Steel, Chauffeurs, Warehousemen, Handlers, Helpers and Alloy Fabricators Union, Local 714, I.B. of T., Respondents.
 No. 17318.
 United States Court of Appeals Seventh Circuit.
 November 6, 1969.
 
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Ian Lanoff, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Michael N. Sohn, Jerome Weinstein, Attys., N. L. R. B., for petitioner.
 Marvin Sacks, Chicago, Ill., Levin & Berger, Chicago, Ill., of counsel, for respondent Union.
 Before DUFFY, Senior Circuit Judge, SWYGERT and CUMMINGS, Circuit Judges.
 DUFFY, Senior Circuit Judge.
 
 
 1
 The National Labor Relations Board (Board) petitions for enforcement of its decision and order[1] issued on October 23, 1967, finding respondent Chicago Roll Forming Corporation (Company) and the Union guilty of violating respectively Section 8(a) (1) and (3) and Section 8 (b) (1) (A) and (2) of the National Labor Relations Act (Act) as amended, (61 Stat. 136, 73 Stat. 519, 29 U.S.C. Sec. 151 et seq.) Although the Company has acquiesced in the Board's ruling, the Union challenges it.
 
 
 2
 The Board found that the Company and Union through their agent Bone respectively violated the Act by threatening various employees with reprisals and in discharging and causing the discharge of employees Scott, Hawkins and Walker because they engaged in protected union activities.
 
 
 3
 James Bone was the Union steward for the Company's production, maintenance and shipping employees. Harold Beebe was the Company's president; Gobal Stalker was the plant superintendent. Richard Schumacher was the Union business representative.
 
 
 4
 Bone, as Union steward, signed up employees for the Union. He would also present grievances including the matter of discharges to superintendent Stalker. Bone would aid an employee in his presentation of grievances to Stalker. If the matter was not resolved, Bone would then confer with Beebe.
 
 
 5
 Bone had additional responsibilities to those pertinent to his position as Union steward. For a period he was identified as "foreman" and leadman in the Company's paintshop and in September 1965, he became the leadman in charge of fifteen employees in the welding and fabrication department. As leadman, Bone was responsible for the completion by his department of work orders which had been given to him to fill.
 
 
 6
 Bone assigned jobs to the employees under him and described to them the welding work to be done. He trained new welders, inspected the work and ordered corrections when necessary. Bone had a desk in the welding department for the performance of paper work.
 
 
 7
 When Bone was short handed, he would inform superintendent Stalker who would either obtain additional help or would authorize Bone to get more help from the leadmen of other departments.
 
 
 8
 When there was overtime to be worked in either the welding department or elsewhere, Bone, after authorization by Stalker, would recruit and select the employees to handle same.
 
 
 9
 Bone occasionally recommended employees for hire, promotion, discipline and discharge, but he did not have final authority in these areas. Bone's duties as leadman took up about 50% of his time. Bone was paid by the hour and received the same overtime premiums that the hourly workers received.
 
 
 10
 Union member James Scott was a laborer under Bone in the welding and fabrication department, and had been employed by the Company for about three years.
 
 
 11
 During the week ending November 6, 1965, James Scott became concerned over Bone's concurrent duties as shop steward and as leadman for the Company. He and his wife drafted a protest letter stating that Bone could not give fair representation to the Union and to the Company at the same time.
 
 
 12
 Scott met with four Company employees at Scott's home. They all signed the protest letter. Scott solicited signatures of nine additional employees. Two of these, Walker and Hawkins, had been recently employed by the Company and were not yet members of the Union. They were probationary employees.
 
 
 13
 Scott sent copies of the signed protest letter to Bone, to Union business representative Schumacher and to Joint Council No. 25 of the Teamsters Union. That same day, Bone asked employee Williams whether they were trying to stab him in the back. Bone then declared that "they would get" the employees "one by one for signing that petition." In a conversation with Scott about Hawkins and Walker, Bone said "I am going to fire them."
 
 
 14
 Plant superintendent Stalker asked Bone to inform Hawkins and Walker that he wanted to see them, but later Stalker approached these two employees at their respective work stations and told them to punch out and go home. Hawkins and Walker asked if there was something wrong with their work and Stalker replied "No" but the "big bosses couldn't keep [him] any more * * * because [he was] trying to make trouble between the Union and the men."
 
 
 15
 The Board also found that Walker asked superintendent Stalker why he was being discharged and whether his work was unsatisfactory, and that Stalker replied it was due to the letter he signed when he wasn't in the Union. Bone also stated he was fired "because of the petition that [he] signed."
 
 
 16
 The next day, Bone told Scott to report on the following day to the paint booth and replace Leonard Burton who, for the past year, had been operating the spray gun. Scott declined because of his sinus condition. The following morning Scott reported to Stalker at his office and again explained he could not take the paint job because of his sinus condition. Then Bone advised Scott to take the paint job but Scott replied he could not do so because of his health. Bone then said to Stalker "If he don't take it, give him his check." Scott asked Bone to file a grievance for him or to give him a statement for his discharge, but Bone refused. Stalker then brought Scott his final check and Scott left. Later Schumacher told Scott that president Beebe would not take Scott back under any circumstances.
 
 
 17
 The Board found that Bone was acting on behalf of the Union. The Board also found that Bone aided in the discharge of the three employees in his role as Union steward. On this basis the Union was held liable for Bone's actions.
 
 
 18
 We must determine whether or not substantial evidence on the record as a whole supports the Board's finding that James Bone, acting as the agent of the Union and supervisor for the Company, threatened employees because of their protected activities, and that the Union and the Company caused the discharge of employees James Scott, Eddie Walker and Willie Lee Hawkins also because of their protected activities. Revere Copper & Brass, Inc. v. N. L. R. B., 324 F.2d 132, 135 (7 Cir., 1963).
 
 
 19
 The voluminous record in this case is full of conflicting testimony. The trial examiner was required to make credibility resolutions. Saginaw Furniture Shops, Inc. v. N. L. R. B., 343 F.2d 515, 516 (7 Cir., 1965), and he did so. On the basis of his credibility resolutions, the trial examiner found the testimony of Stalker as to the alleged loafing incidents by Hawkins and Walker was manufactured out of whole cloth.
 
 
 20
 Pertinent is the language in Saginaw Furniture Shops, Inc., supra, at page 517: "Petitioner contends that there is greater reason to accept the testimony of its witnesses than those called by the General Counsel. If we were to decide the case de novo upon our reading of a dry record, we might be inclined to accept petitioner's version of the facts. Our role, however, is limited. Where there is a conflict in the testimony of witnesses, the determination of credibility is peculiarly for the trial examiner as the trier of facts. Sunshine Biscuits, Inc. v. N. L. R. B., 274 F.2d 738 (7 Cir., 1960). Moreover, if the credited testimony supports conflicting inferences, the inferences drawn by the examiner must be accepted if reasonable when considered in the light of the entire record. Sunshine Biscuits, Inc. v. N. L. R. B., supra. The briefs and oral argument present us with two hopelessly irreconcilable versions of what took place * * *. Consequently we are constrained to resolve the questions before us by utilizing the norms we have just stated."
 
 
 21
 Walker testified he was never reprimanded by the Company official or representative for being either late or absent. Hawkins testified he was criticized by Stalker for being late on only one occasion, but at the same time he was complimented on the good work he was doing in the paint shop.
 
 
 22
 We hold the Board had substantial credible evidence to conclude that in view of the testimony of Bone's explicit threats to fire Walker and Hawkins because they signed the protest, and since neither Walker nor Hawkins was late or absent on November 26 when they were fired, that the alleged past misconduct of these employees was resurrected. That the real motivation in their discharge was their participation in the letter of protest.
 
 
 23
 As to Scott, his dismissal came just two days after Bone received the protest which he had prepared. Bone's remark, credited by the trial examiner, "they would get one by one" the employees who participated in the protest, indicates clearly the true reason for Scott's dismissal. It is undisputed that Scott had performed his work well for over three years of his employment although at one point he was forced to change his job classification from welder to laborer because of his health problem.
 
 
 24
 The Board had substantial credible evidence and was justified in holding that neither Bone nor Stalker was genuinely interested in replacing Burton for the operation of the spray gun although that was the reason given for Scott's new assignment.
 
 
 25
 There is substantial credible evidence on the record as a whole that the reasons asserted for Scott's dismissal were false, and that the real motive was to get rid of the man who sought to upset the roles which Bone played as leadman for the Company and steward for the Union.
 
 
 26
 We hold there is substantial credible evidence to justify the Board concluding that Bone was acting on behalf of the respondent Union. We therefore uphold the Board's ruling that the respondent Union should be liable for the acts performed on its behalf by its agent Bone.
 
 
 27
 We hold that the order of the Board should be
 
 
 28
 Enforced.
 
 
 
 Notes:
 
 
 [1]
 The Board's decision and order are reported at 167 NLRB No. 134