**IRVING AIR CHUTE COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 498, Docket 29425.**

United States Court of Appeals Second Circuit.

Argued June 2, 1965.

Decided Aug. 18, 1965.

Arnold I. Burns, New York City (Mermelstein, Burns & Lesser, Jay D. Fischer, Donald M. Ochacher, New York City, of counsel), for petitioner.

Nancy M. Sherman, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Atty., N. L. R. B., of counsel), for respondent.

Before MOORE and ANDERSON, Circuit Judges, LEVET, District Judge.*

MOORE, Circuit Judge.

Irving Air Chute, Inc. (Irving or the Company) petitions to review and set aside the decision and order of the National Labor Relations Board (the Board) which directed the Company to cease certain violations of the National Labor Relations Act, as amended (the Act), and to recognize and bargain with the Textile Workers Union of America (TWU or the Union). The Board in its answer

cross-petitions for the enforcement of its order.

On June 5, 1963, a Board-supervised representational election was held among the employees of the Company's Marathon Division, Cortland, New York, pursuant to a petition for representation filed by the Union on April 30, 1963. The Union lost but filed charges alleging the commission of unfair labor practices which adversely affected the election result.

A Board Trial Examiner found that the Company violated section 8(a) (1) of the Act by threatening its employees with reprisals for engaging in union activities; that the Company violated sections 8(a) (1) and (2) of the Act by suggesting, assisting and promoting the formation of an "inside" labor organization; and that the Company violated section 8(a) (5) of the Act by refusing to bargain with the Union. The Examiner's conclusions were approved by the Board.

1. *The 8(a) (1) violation:* [1] The Board found that on April 26, 1963, Payne, an admitted Company supervisor, observed Kinner, an employee, carrying union literature. Payne asked Kinner if he were trying to get himself fired for carrying the literature. Payne also told Kinner that the Company might move its Marathon plant to Kentucky if the Union succeeded in organizing the plant.[2]

On April 29, Mathewson, the plant manager, told Kinner that he had orders to fire all the Union agitators among the employees and that there would be reprisals against the members of the paint department, where Kinner worked, because of their union activity.

▪ These statements constitute a clear violation of section 8(a) (1). Threats of discharge for pro-union activity tend to deny employees the free exercise of the right of self-organization guaranteed by section 7 of the Act.

---

* Of the Southern District, sitting by designation.

1. Section 8(a) (1) of the Act provides:
 Sec. 8(a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or co-

erce employees in the exercise of the rights guaranteed in section 7;

2. Payne also told Kinner that the Smith-Corona Corporation might also move its nearby plant to Kentucky if the Union came into that plant.

NLRB v. Syracuse Stamping Co., 208 F.2d 77 (2d Cir. 1953). Threats to close a plant if a union organizing drive is successful obviously have a similar coercive effect. NLRB v. Somerset Classics, Inc., 193 F.2d 613 (2d Cir.), cert. denied sub nom. Modern Mfg. Co. v. NLRB, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635 (1952); NLRB v. Franks Bros., Inc., 137 F.2d 989 (1st Cir. 1943), aff'd 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435 (1944).

Irving argues that there is no evidence (1) that these threats were authorized or sanctioned by the Company or were part of any program of coercion; (2) that similar threats were made to other employees or that Kinner ever communicated these threats to anyone prior to the election of June 5th; and (3) that such threats affected Kinner or the union preference of other employees.

 However, "declarations made by 'supervisory employees' will charge the employer [under the Act] [even] though they would not charge him under the doctrine, of respondeat superior." NLRB v. Moench Tanning Co., 121 F.2d 951, 953 (2d Cir. 1941). This broader rule places responsibility on an employer for acts of a supervisor when "employees would have just cause to believe that he was acting for and on behalf of the company." NLRB v. Texas Ind. Oil Co., 232 F.2d 447, 450 (9th Cir. 1956). The Company in the present case is thus certainly responsible for Mathewson's statement on May 29. Although Payne's earlier threats, standing alone, might well be attributed to the Company, Mathewson's encounter with Kinner in effect placed the stamp of official approval on Payne's action.

 Evidence of the dissemination of the Company's threats or that they were part of an organized program of coercion is also not required. The Union's organizing drive began on April 5, 1963 and "any expressions of company attitudes even to small groups of individuals, were likely to be rapidly disseminated around a plant during the struggle of organization."[3] Bausch & Lomb Optical Co. v. NLRB, 217 F.2d 575, 576 (2d Cir. 1954). The Company cannot claim its threats are *de minimis* as a mere isolated incident since they were reiterated and took place in a context where their effect was enhanced. Similarly, proof of the actual effect of the Company's threats is not required in view of their inherently coercive nature. Elastic Stop Nut Corp. v. NLRB, 142 F.2d 371 (8th Cir. 1944). Thus it is enough in this case that these threats were made.

2. *The combined 8(1) and (2) violations:*[4] On May 13, 1963, about two weeks after receipt of the Union's initial bargaining demand issued on April 25 Mathewson and Wallace, the plant business manager, met employees Fear and Wells in a local bar. Wells testified that Wallace mentioned that the plant employees "could have a Committee going in the shop instead of getting a Union." On May 17 Wallace stated to the assembled plant employees:

"I don't see why a small group of employees, who could represent all of you, couldn't work together with management without bringing in outside interference. We all make mistakes, but we would like to be told about them. We don't like to receive a telegram telling us of them. A talk every week or every 2 weeks between management and a group representing the employees would be welcomed."

---

3. This common sense observation holds true despite the fact that there is some evidence that Mathewson asked Kinner not to mention their conversation to anyone.

4. Section 8(a) (2) of the Act provides: (that it shall be an unfair labor practice for an employer—)

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 6, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

Wallace reiterated his suggestion at a second meeting of the assembled plant employees held on May 29:

> "I see no reason why we can't deal with our problems without outsiders. We could get together periodically, either singly or in a group to discuss our problems. Some folks need someone to talk to them, perhaps a group could be approved by *you* to meet with management." [Emphasis in original.]

At the May 29 meeting Clark, a plant employee, told Wallace that he had a petition for an employees' committee signed by 50 fellow employees and asked what the Company planned to do about the petition. Wallace took the document and replied that he was "pretty sure" the Company would recognize the Committee.

After the Wallace statement of May 17, the Company gave considerable support to the formation of the committee. A supervisor granted Clark permission to keep the petition in the department where he worked so that employees could sign it during working hours. Supervisory employees circulated the petition through their departments for signatures and arranged for the Company to print ballots for the election of committee members. Supervisor Lee appeared on the ballots as one of the nominees for membership in the committee. Supervisor Harper and employee Keller helped count the ballots after they were cast. Supervisor Irvin then had an office employee type up a notice informing employees about the existence and purposes of the committee. The notice invited employees to deposit any suggestions to the committee in a ballot box on a wall in the plant.

The committee never functioned nor was ever extended formal recognition by the Company. Nevertheless, the Trial Examiner and the Board concluded that the Company's support of the committee violated section 8(a) (1) and the "interference" prohibitions of section 8(a) (2), although it did not violate the "domination" prohibitions of section 8(a) (2).

Irving does not deny that its supervisors made the suggestions or lent the assistance noted above. The Company argues that Wallace's statements were protected under the First Amendment to the United States Constitution and section 8(c) of the Act. The Company also contends that the committee was formed by Clark and other employees independent of any company suggestion or aid.

█ The Board's findings "cannot stand in the face of the First Amendment or of § 8(c) if the employer's statement * * * does not contain some threat of reprisal or force or promise of benefit." Coppus Eng'r Corp. v. NLRB, 240 F.2d 564, 570–571 (1st Cir. 1953). But "in determining whether such statements and expressions [urging formation of an independent labor organization] constitute, or are evidence of unfair labor practice, they must be considered in connection with the positions of the parties, with the background and circumstances under which they are made, and with the general conduct of the parties. If, when so considered, such statements form a part of a *general pattern or course of conduct* which constitutes coercion and deprives the employees of their free choice guaranteed by section 7 [of the Act], such statements must still be considered as a basis for a finding of unfair labor practice." (Emphasis supplied.) NLRB v. Kropp Forge Co., 178 F.2d 822, 828–829 (2d Cir. 1950).

█ In this context the Board's conclusions were consistent with well-established principles. It has been consistently held that employer support of an "inside" or "independent" labor organization, even absent company domination, constitutes unlawful interference with employees' freedom of choice within the meaning of section 8(a) (2). NLRB v. Link-Belt Co., 311 U.S. 584, 597–600, 61 S.Ct. 358, 85 L.Ed. 368 (1941); NLRB v. Philamon Labs., Inc., 298 F.2d 176 (2d Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); NLRB v. Buitoni Foods Corp., 298 F.2d 169, 173 (3d Cir. 1962); International Union of

United Brewery, etc., Workers of America, AFL–CIO v. NLRB, 111 U.S.App. D.C. 383, 298 F.2d 297 (1961), cert. denied sub nom. Gulf Bottlers v. NLRB, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); NLRB v. Seamprufe, Inc., 186 F.2d 671 (10th Cir.), cert. denied, 342 U.S. 813, 72 S.Ct. 26, 96 L.Ed. 614 (1961); Reliance Mfg. Co. v. NLRB, 125 F.2d 311, 314 (7th Cir. 1941). Irving's activities fall well within the facts of these cases, since there was substantial evidence that the Company and not its employees was the driving force behind formation of the committee and that this support was extended in an effort to divert employees from support of the TWU.

The Company's free speech arguments also lack substance. Even "[s]light suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure." International Ass'n of Machinists, etc. v. NLRB, 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1941). Such is clearly the case here where Irving's consistent and reiterated expressions of preference and support for an employees' committee in the midst of a TWU organizing campaign left little doubt where the Company stood and placed the employer's considerable influence behind formation of the committee. Thus Irving's violation of the "interference" provisions of section 8(a) (2) also amounts to the coercion left unprotected by section 8(c).

3. *The 8(a) (5) violation:* [5] On April 25, Ryan, the Union's international representative, sent a telegram to Wallace stating that the Union represented a majority of Marathon Division employees and that he "wished to sit down with you and your representatives to negotiate a collective bargaining agreement." Wallace replied on April 29 that he would not be able to meet with the Union until May 6 due to a death in his immediate family. Ryan replied on the following day that he would have to file a petition with the NLRB for a representation election but would withdraw the petition if the parties reached an amicable agreement.

On May 6 Wallace returned to his office and received Ryan's telegram. He communicated with Ryan that afternoon and asked if the Union had proof of its majority status. Ryan replied that a majority of employees had signed union authorization cards and offered to submit the cards to a count by an impartial person such as a priest, minister or rabbi. Wallace then stated that the filing of the representation petition had "put a different light on the question of recognition" and that he wanted an opportunity to discuss the matter with his superiors. Ryan replied that while the Union did not mind a delay of the meeting, "we still want recognition." However, neither party ever met or communicated with the other after this conversation.

█ Although there may be a real doubt that the Company refused to bargain in violation of section 8(a) (5), nevertheless the Company's silence after May 6 could justifiably be considered as a refusal of union recognition and bargaining requests which had been reiterated on that date. Through Wallace, the Company made an implied agreement to confer with the Union after the representation petition had been discussed by higher management. The burden was then upon the Company to take the next step in the face of a bargaining demand which had not been withdrawn. Scobell Chem. Co. v. NLRB, 267 F.2d 922, 925 (2d Cir. 1959). In his speech of May 29, Wallace also stated that "because [the Union] filed a petition, we couldn't make our meeting—nothing to talk about that time until the [National Labor Relations

---

5. Section 8(a) (5) of the Act provides: (that it shall be an unfair labor practice for an employer—)

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

Board] hears our case," making it clear that the Company was not interested in talking to the Union until compelled by the Board.

 Nor was this refusal to bargain based on a good faith doubt of the Union's card majority. The Company never responded to the Union's offer of an impartial count of the cards on which this majority was based or otherwise expressed a doubt that majority status had been achieved. The anti-union activity by the Company both reinforces the Board's conclusion that the Company refused to bargain and established that this refusal was in bad faith. Allegheny Pepsi-Cola Bottling Co. v. NLRB, 312 F.2d 529, 532 (3rd Cir. 1962); Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); NLRB v. Crystal Spring Finishing Co., 116 F.2d 669 (1st Cir. 1941). The Company appeared to rely on the filing of the petition as an excuse for its refusal to bargain. However, the Board has recently held that a request for an election does not constitute waiver of a bargaining demand. Bernel Foam Prods., Inc., 146 N.L.R.B. No. 161 (1964).[6]

 4. *The Remedy:* The Board has ordered Irving to bargain with the Union as the exclusive representative of its employees. Irving contends that this remedy is inappropriate and that a new election should have been ordered.

"It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." International Ass'n of Machinists, etc. v. NLRB, 311 U.S., supra, at 82, 61 S.Ct. at 89; NLRB v. Stow Mfg. Corp., 217 F.2d 900 (2d Cir. 1954), cert. denied, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955). Moreover, the Board's remedy

appears reasonable. It is uncontested that the Union held a valid card majority at the time of its May 6 bargaining demand. The Company presumably would have had no valid reason to avoid bargaining if the Union's offer of an impartial count had been accepted. This Court has specifically stated that an employer's refusal to examine signed union authorization cards would create an appropriate foundation for a bargaining order. Edward Fields, Inc. v. NLRB, 325 F.2d 754 (2d Cir. 1963); NLRB v. Dahlstrom Metallic Door, Inc., 112 F.2d 756 (2d Cir. 1940). The Board's bargaining order accordingly gives the Union no more than it could fairly claim as a result of the Company's refusal of the May 6th demand for recognition. Bernel Foam Prods., Inc., supra. We are not unmindful of our decision in NLRB v. Flomatic Corporation, 2 Cir., 347 F.2d 74 (June 14, 1965) in which a new election was ordered. In that case, however, there was only a minimal § 8(a) (1) violation and no demand and refusal to bargain. The appropriate remedy must be fashioned to meet the situation presented in each particular case and often depends on factual differences seemingly slight but sufficient to tip the scales in favor of the Board's conclusion. Here an election at this time would be manifestly unfair to the Union since it would allow the Company to reap the benefits of its anti-union acts and undoubtedly would result in additional costs to the Union of a new organizational drive. It would, therefore, be inappropriate for this Court to reverse the Board's decision and order a new election. NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942).

Petition for review denied.

Decree of enforcement granted.

---

6. The change of prior practice signified by the Bernel Foam case has been held to constitute a proper exercise of the Board's discretion in shaping an appropriate remedy. International Union of Elec. Workers v. NLRB, 352 F.2d 361 (D.C.Cir.1965).