**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**A & S ELECTRONIC DIE CORP. and
A & S Steel Rule Die Corp.,
Respondents.**

**No. 418, Docket 33994.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1970.

Decided March 11, 1970.

Stanley J. Brown, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John D. Burgoyne, N. L. R. B., Washington, D. C., on the brief), for petitioner.

Joseph S. Rosenthal, New York City (Friedlander, Gaines, Ruttenberg & Goetz, New York City, on the brief), for respondents.

Before WATERMAN and ANDERSON, Circuit Judges, and TYLER, District Judge.*

ANDERSON, Circuit Judge:

The A & S Electronic Die Corp. and the A & S Steel Rule Die Corp. are affiliated companies which are operated as single business enterprise. The A & S factory, at which approximately 70 nonsupervisory workers are employed, is located in Long Island City, Queens. Prior to the events which brought about the present petition,[1] A & S had experienced no union organizing activity.

The facts found by the Trial Examiner were substantially as follows. On March 2, 1967, Israel Cruz, one of the four A & S truck drivers, signed an authorization card for Local 807 of the International Brotherhood of Teamsters, Chauffeurs,

Warehousemen and Helpers of America, and he secured the signatures of two of his fellow drivers, Andrew Reynolds and Juan Rivera. Their cards were turned over to the Teamsters' local, which, on March 7, filed a petition with the Board for a unit limited to the four A & S drivers. At the same time it sent a letter to Walter Solmsen, president of A & S, requesting recognition as bargaining agent for the drivers.

Solmsen, who had not been aware of any union activity, called the drivers to his office on March 8th. Cruz arrived first and conversed privately with Solmsen. Solmsen told Cruz that he had received a letter from the Teamsters, and asked if Cruz was one of the employees who favored unionization. When Cruz said that he was, Solmsen stated "maybe we can settle this without a union" and offered Cruz a $10 per week raise if he would "forget the union." When Cruz rejected the offer, Solmsen said if the men wanted a union, he would not fight it.

The other three drivers, Reynolds, Rivera and John Sojourner then arrived at Solmsen's office, and Solmsen repeated that the Teamsters claimed to represent a majority of the drivers, and asked if this were true. Rivera and Reynolds both said that they had signed for the union, but Sojourner said that he had not. Solmsen again stated that if they wanted a union, they could have one, and terminated the interview.

About a week after the interviews, organizers of another union, Local 106 of the International Production, Service and Sales Union, appeared at the A & S truck bay during the employees' lunch break, passed out authorization cards and urged the men to sign up. Elliot Klein, the A & S purchasing clerk, and Kurt Lobbenberg (known as Loeb), the A & S shipping foreman, were present.

* Of the Southern District of New York, sitting by designation.

1. Unfair labor practice charges were filed by District 65 of the Retail, Wholesale and Department Store Union, AFL–CIO, and by Israel Cruz, a former employee, against the company. The various proceedings were consolidated and a hearing was held before the Trial Examiner on December 4, 1967.

Loeb, who was handing the men cards for Local 106, and Klein urged them to sign, stating "it is a good union, sign the card" and "the boss won't mind."

Solmsen himself also made some efforts on behalf of Local 106. Shortly thereafter, Solmsen summoned Robert Geller, an inspector for A & S, and asked if he would sign a Local 106 card "as a favor." Geller declined, but indicated he would not oppose that union. Not long afterwards, however, Geller became active in the organizational efforts of a third union, District 65 of the Retail, Wholesale and Department Store Union, AFL-CIO. When Solmsen learned of Geller's activity on behalf of District 65, he again called Geller to his office and asked him why he had changed his mind and had become "involved." When Geller stated that he felt District 65 would be the best union for the employees, Solmsen indicated that things would remain the same no matter which union was chosen, and the conversation ended.

Prior to the receipt by Solmsen of the letter from the Teamsters, both Cruz and Reynolds were receiving substantial overtime work. Following the interviews of March 8, the overtime of both these drivers was reduced to less than one hour per week, while that of Sojourner, who had not signed a Teamsters' authorization, showed significant increases. Rivera, who had signed an authorization card, had received little or no overtime work prior to March 8, and his situation remained unchanged. A & S offered no explanation for the drop in Reynolds' overtime, but did show that Cruz had been arrested by the New York police on narcotics charges (which were subsequently dismissed) and that marijuana cigarettes had been found in his truck on one occasion when another driver took over for Cruz. In addition, Cruz was habitually absent from work and refused to explain his truancy.[2]

Trial Examiner Martin concluded that A & S had violated § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by offering a raise to Cruz and by interrogating Reynolds, Rivera, Sojourner and Geller as it did; it had violated § 8(a) (1) and (2), 29 U.S.C. § 158(a) (1) and (2), by the soliciting of Klein and Loeb on behalf of Local 106; and it had violated § 8(a) (1) and (3), 29 U.S.C. § 158 (a) (1) and (3), by reducing the overtime work given to Cruz and Reynolds. The Board, without discussion, substantially adopted the Trial Examiner's findings, conclusions and recommendations, and issued a cease and desist order together with orders to post the standard notice for sixty days and to make whole Cruz and Reynolds for their losses in overtime pay. 172 N.L.R.B. No. 168 (1968).

■ With regard to the offer of a $10 per week wage increase to Cruz, it is clear that such an offer, made to induce an employee to forswear his pro-union predilections, is violative of § 8(a) (1). Waycross Sportswear, Inc. v. NLRB, 403 F.2d 832, 835 (5 Cir.1968); NLRB v. Philamon Laboratories, Inc., 298 F.2d 176, 180 (2 Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed 2d 498 (1962). The company attacks the facts found on this point by arguing that "the trial examiner's credibility finding * * * is without foundation." But this court has consistently held that the question of credibility is to be resolved by the trial examiner. See NLRB v. Dinion Coil Co., 210 F.2d 484, 487–490 (2 Cir. 1952); NLRB v. L. E. Farrell Co., 360 F.2d 205, 207 (2 Cir. 1966).

■ The interrogation of Reynolds, Rivera and Sojourner presents a different question. When Solmsen received the letter from the Teamsters requesting recognition, he had a right to inquire of his employees whether they indeed desired such union representation. There are no indications that Solmsen threatened these three employees or in any way attempted to lure them away from the union. The questioning was neither

---

2. The complaint had also charged that the dismissal of Cruz on August 28, 1967, was in retaliation for his union activities. The Trial Examiner and the Board both found the dismissal justified and that question is, therefore, not before us.

harsh nor coercive; on the contrary, the atmosphere was apparently rather informal.[3] Where the employer's questions are designed simply to determine the true status of the union and are in no way threatening or coercive so as to inhibit the employees' organizational activities, there is no violation of § 8(a) (1). See NLRB v. Firedoor Corp. of America, 291 F.2d 328, 331 (2 Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961); Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964); NLRB v. Milco, Inc., 388 F.2d 133, 137–138 (2 Cir. 1968). Most of Solmsen's conversation with Geller was free from "threat of reprisal or force or promise of benefit," and was not in violation of § 8(a) (1); but Solmsen expressly solicited Geller to sign a card in favor of Local 106 as bargaining agent. Geller also testified that Solmsen assured him that, if Local 106 got in, things in the shop would continue as they had been, with no change in Geller's personal position, carrying with it the obvious implication that things would be different if another union got in. This was sufficient to support the Board's conclusion that the company was in violation of § 8(a) (1) and (2). NLRB v. Midtown Service Co., Inc., 425 F.2d 665 (2 Cir. Feb. 25, 1970).

The company also contests the Board's finding that the solicitations by Klein and Loeb on behalf of Local 106 were violative of § 8(a) (1) and (2). It does not challenge the finding that Klein and Loeb were supervisors within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11), but it asserts that their actions were not improper because "no other labor organization was attempting to organize the production and shipping employees of respondents." The absence of a competing union, however, does not insulate an employer from the finding of an unfair practice when he encourages his employees to join a particular union. Abinante & Nola Packing Co., 26 N.L.R.B. 1288, 1316–1317 (1944). See Revere Copper & Brass, Inc. v. NLRB, 324 F.2d 132, 136 (7 Cir. 1963). Where supervisory personnel distribute union authorization cards to employees and urge them to sign because "it is a union with good benefits" and "the boss approves of it," it can hardly be said that the company was not supporting the formation of a labor union or interfering with the organizational rights of its employees, nor are such actions protected within the meaning of § 8(c), 29 U.S.C. § 158(c). Irving Air Chute Co. v.

---

3. The only testimony on this point was that of Solmsen, himself. On direct examination he stated:

"Q. Now, tell me exactly what happened at this meeting? A. I called the men in and I told them that I was very surprised to receive a letter by the Teamsters Union that the drivers have signed up and that they have the majority of my drivers, and I wanted to know whether this was true.

And as this was confirmed to me, I said I can't understand you boys, you have good jobs here and I can't see any benefits by a union, but if you feel that this is what you want, you can have it. I am not going to fight any union at all.

Q. Did you say anything else to them? A. I don't think so.

Q. Well, do you recall saying anything else to them? A. I did not."

On cross-examination by the General Counsel, Solmsen merely confirmed his earlier testimony:

"Q. Did you ask them if they signed cards for 107? A. I don't know what I said. I didn't even know that you have to sign cards at that time. I may have said did you call in the union. They write they have the majority so is that true? They may have answered yes.

Q. Did they answer yes, did you know whether they had the majority? A. Yes, three men said yes.

Q. Which three men said yes? A. Israel Cruz, Juan Rivera and Andy Reynolds, and John Sojourner said he didn't sign."

The finding by the Trial Examiner, based on Solmsen's testimony was:

"On cross-examination he was vague and uncertain as to what he had asked the drivers and said to them. He admitted he may have asked them if they 'call[ed] in the union,' and that three of them: Cruz, Reynolds and Rivera replied 'Yes,' and the fourth, Sojourner, replied that 'He didn't sign.'"

NLRB, 350 F.2d 176, 180–181 (2 Cir. 1965).

■■ The Board's conclusion that A & S violated § 8(a) (1) and (3) by reducing the overtime work of Cruz and Reynolds because of their union activities is fully supported by the record as far as Reynolds is concerned. See NLRB v. Buddy Schoellkopf Products, Inc., 410 F.2d 82, 86–87 (5 Cir. 1969); Trumbull Asphalt Co. of Delaware v. NLRB, 314 F.2d 382, 383 (7 Cir.), cert. denied, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963). Cf. Gulf Building Corp., 159 N.L.R.B. 1621, 1631–1632 (1966). With regard to Cruz, however, the Trial Examiner found on ample evidence that the company was justified in dismissing Cruz because of his frequent absences from work and because he was using the company's truck after hours for illicit activities involving the transportation of narcotics. The improper use of the truck also justified the company in stopping his use of it in overtime work, for it was the overtime use which made the truck available to him for his own purposes.[4] The Trial Examiner found, however, that that did not necessarily excuse the deletion of Cruz's overtime between 4:30, the standard closing time, and 6:30 p. m. when Cruz customarily took the parcels to the Post Office for mailing. The company urges that for the same justifiable reasons it arranged to have the mailing taken care of by other means. The mere coincidence of the time of the termination of the overtime use of the truck by Cruz and the union's effort at organization of the plant do not support the conclusion that the limitation on his use of the truck was a reprisal for his pro-union activities, in the absence of any supporting evidence offered by the General Counsel.

On the record as a whole, as it bears on the issue of Cruz's overtime, we are of the opinion that the Board's conclusion is not supported by substantial evidence and enforcement of that portion of the order should not be granted.

Enforcement of the Board's order is granted insofar as it relates to the interrogations of Cruz and Geller, the activity in support of Local 106, and the reduction of Reynolds' overtime. As to those portions of the order which relate to the questioning of Reynolds, Rivera and Sojourner and the reduction in Cruz's overtime, enforcement is denied.

TYLER, District Judge (dissenting in part):

I disagree with the opinion of the court on three issues.

1. I would deny enforcement of that part of the order which found that A & S had violated § 8(a) (1) and (2) of the Act through "the soliciting" by Klein and Loeb on behalf of Local 106. In my view, the unrepeated statements of Klein and Loeb fell far short of constituting a pattern of coercion of A & S employees and thus should be regarded as protected by § 8(c) of the Act.

Recent cases in this circuit and elsewhere seem to have stanched an earlier flow of judicial pronouncements tending to ignore employers' First Amendment rights. This flood was and at least occasionally still is encouraged by decisions of the Board tending to condemn virtually any and all anti-union expression by an employer without giving sufficient weight to § 8(c).[1] As I understand the current case law in this circuit, however, § 8(c) must be read to permit the employer a certain degree of latitude in expressing his point of view when faced

---

4. As the Board said in its brief, p. 20: "If, however, the driver was required to work beyond 6:30 P.M., such as to take orders to the Post Office, he could not return the truck to the plant because it was closed. Accordingly, in that case, the driver was permitted to take the truck home overnight and return it the next morning."

1. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, painted, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

with unionization. NLRB v. Golub Corporation, 388 F.2d 921 (2 Cir. 1967); accord, Schwarzenbach-Huber Company v. NLRB, 408 F.2d 236, 252–255 (2 Cir. 1969). By the terms of that section, to constitute a violation of § 8(a) (1) or (2), statements made by or on behalf of an employer must contain some "threat of reprisal or force or promise of benefit." I believe that the majority opinion effectively vitiates this principle.

True, there is undisputed evidence that Klein and Loeb, as supervisory agents acting for Solmsen, made it known to various other employees that Solmsen considered Local 106 to be a good union and was not opposed to it. Significantly, as I see the problem, most of this comparatively mild activity occurred during a single afternoon. Nobody was pressured or even exhorted to any appreciable extent. Hence, taking the evidence in the best light for the Board, I am at a loss to understand how this expression of management opinion by Klein and Loeb amounted to a "general pattern or course of conduct which constitute[d] coercion and deprive[d] employees of their free choice." Irving Air Chute Company v. NLRB, 350 F.2d 176, 180 (2 Cir. 1965); cf. NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S. Ct. 1918, 23 L.Ed.2d 547 (1969).[2]

2. A similar view, it seems to me, is justified in respect to the issue of Solmsen's conversations with Geller. These conversations took place in a general office with a number of non-management people nearby; they were certainly informal.[3] Solmsen, of course, intended to influence Geller and in effect manifested his disapproval of Geller's association with District 65. But these conversations amounted to nothing more than the natural and, under the circumstances, re-

markably temperate reaction of a small businessman faced for the first time with the unionization of his business. Absent threats or coercion, § 8(c) permits an employer to make known his argument or opinions on a matter by which he is so directly affected. As I read the record, there were no threats, overt or implied, by Solmsen (Appendix 55–57); indeed, Geller admitted that Solmsen promised him that his, Geller's, position would not suffer or change if by chance Local 106 "were to get in" despite Geller's refusal to sign with that union. Arguably, of course, one could construe Solmsen's remarks (Appendix 57) as a veiled threat of dire consequences to Geller if 106 did not get in, but I cannot believe that either this court or the Board has meant to rely on such morbid conjecture.

3. Finally, I would deny enforcement of the order respecting the allowance of lost overtime to Reynolds, a driver, as well as to Cruz. Essentially, the trial examiner based the allowance to Reynolds on the following simplistic rationale: (1) Reynolds signed with the Teamsters; (2) driver Sojourner did not; (3) subsequently Reynolds' overtime fell off but Sojourner's increased; (4) it follows as day from night that the sole cause of (3) was the employer's desire to penalize Reynolds for his Teamsters affiliation. But there are other facts in the record. Reynolds earned $201 for overtime work during the first quarter of 1967; he earned $48.58 for overtime work during the second quarter; he earned $8.33 for overtime work from July 1 through 26 when he left the company. For overtime work, Sojourner earned $874 during the first quarter of 1967, $916 during the second quarter and $1,107 during the third quarter. There is no evidence,

---

2. "[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" At p. 618, 89 S.Ct. at p. 1942.

3. Of considerable importance is the fact that A & S in 1967 was a small "one-man" enterprise with relatively few employees. The record plainly shows that there was a significant blurring of the line between management and labor. Informality was the rule. Thus, a favorable climate for oppression and coercion was notably absent.

however, of the kind of overtime work done by either Reynolds or Sojourner.

As the foregoing recital indicates, there was an increase of $42 in Sojourner's overtime pay during the second quarter, but his large increase in overtime, $233, came not until the third quarter—i. e. after Reynolds had quit and during the period of Cruz's frequent absences. In sum, there is nothing to indicate that Reynolds' loss was in any way related to Sojourner's gain during the relevant period—except bald speculation that Reynolds' Teamsters affiliation compelled Solmsen to discriminate. Balancing such speculation against the known facts, I would hold that there is insufficient evidence to justify award of the allowance to Reynolds as well as to Cruz.