421 F.2d 1058
 73 L.R.R.M. (BNA) 2350
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
JAN POWER, INC., Maintenance Service; M & M Enterprises Co.,
d/b/a Columbia Building Maintenance Co., Inc., and System
Building Service, Inc.; Service Employers Council, and
Miscellaneous Warehousemen, Drivers & Helpers Union, Local
986, Respondents.
 No. 24178.
 United States Court of Appeals, Ninth Circuit.
 Jan. 23, 1970.
 
 1
 William H. Carder (argued), Abraham Siegel, John I. Taylor, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., for appellant.
 
 
 2
 Julius Reich (argued), of Brundage, Neyhart, Miller, Ross & Reich, Levy, DeRoy, Geffner & VanBourg, Hill, Farrer & Burrill, Los Angeles, Cal., for appellees.
 
 
 3
 Before MERRILL and ELY, Circuit Judges, and BYRNE, District Judge.*
 
 BYRNE, District Judge:
 
 4
 The Service Employers Council is an association composed of employers engaged in the business of providing maintenance or janitorial services for commercial buildings in the Southern California area. It was authorized to bargain collectively on behalf of its members, Jan Power, M & M City Building, and Crystal, as a multi-employer bargaining unit. The Council's negotiator also represented Western as part of the same unit. Until December 20, 1966, the Council was a party to a collective bargaining agreeement covering the maintenance employees of Jan Power, M & M and Crystal with Local 22 of the Confederated Industrial Workers of America. On that date, Local 22 disclaimed any further interest in representing those employees.
 
 
 5
 At that time, Charles Landcraft, a Western employee, was informed by Western's president, that he would be contacted by a representative of a certain union. The same day he was contacted by a representative of respondent, Local 986, who advised him of union benefits, explained the proposed dues checkoff, and described the union membership application. He was then given a supply of membership applications and dues checkoff authorizations, and told to solicit his fellow employees. On his solicitation tour, he was accompanied by the Western president who praised Local 986 to the various employees. Landcraft collected signed authorization and union cards from practically every fellow employee.
 
 
 6
 Several days later, the Western president, Mr. Coughlin, gave Landcraft a package containing all of the authorization cards which had been solicited from Western employees. The cards had been completely filled out in the interim. Coughlin then instructed Landcraft to mail the cards in to the union with his own name and address on the envelope.
 
 
 7
 Local 986 was also busy organizing the employees of Council member M & M Enterprises Company during December 1966. Emmet Allen, Vice-President of M & M approached two employees and asked whether rival union Local 399 had solicited their membership and stated he would prefer that they join Teamsters Local 986. Sam Moot, President of M & M, also solicited an employee, gave him a Local 986 membership application, told him to sign it, and stated that he, himself, would fill in the rest of the required information.
 
 
 8
 In January, 1967, another M & M employee was contacted by an M & M vice-president, who urged him to sign a Local 986 card.
 
 
 9
 There was also active organizing in behalf of Local 986 by Jan Power management. A new employee was told by a supervisor that the employees at Jan Power 'belonged to the Teamsters' and that she would soon be contacted with a card to sign.
 
 
 10
 In early January, a Mr. Chubb, administrator of the Council, recognized Local 986 as the majority representative of the employees of all five companies. Shortly thereafter, Local 986 and the Council began collective bargaining and entered a written multi-employer agreement. Each employer also executed separate copies of the contract which contained a dues checkoff system and a union security clause among its provisions.
 
 
 11
 One month later, three Jan Power employees signed cards authorizing representation by Local 399 of the Service and Maintenance Employees Union. These men were 'accused' of soliciting for Local 399 by a Jan Power supervisor and threatened with dismissal because of this alleged activity. The same warnings were repeated on two more occasions by the supervisor.
 
 
 12
 Later on, one of the three employees was visited by the Jan Power president, who repeated essentially the same questions and threats. The president added that he had certain information that the employee had been soliciting for Local 399 and that this information had come from a 'union spy'.
 
 
 13
 The Jan Power president also visited another employee and handed him a Local 986 membership application for his signature. The worker was told that if he did not sign the card, he would have to pay $16.00 or quit his job. The employee signed. The day before this incident occurred, eight dollars in Union dues to Local 986 were deducted from the employee's paycheck without authorization.
 
 
 14
 Later in the month the working hours of two of the three employees originally visited by the head of Jan Power, were drastically reduced without explanation by the company. Similar activities by the management of M & M against employees expressing an interest in Local 399 occurred during the same month.
 
 
 15
 An M & M vice-president interrogated two employees about whether Local 399 had signed them as members. At this time the manager also stated that the company preferred to deal with Local 986. A few days later one of the employees was warned about talking with Local 399 representatives. He was also characterized by the M & M president as playing 'cat and mouse' with M & M. Another employee who signed a Local 399 card was interrogated by the M & M vice-president about contacts with Local 399.
 
 
 16
 In mid-February, M & M deducted Local 986 union dues from a man's check before the authorization card was signed. Another employee had union dues deducted by M & M without her authorization. When she protested, the vice-president gave her a Local 986 membership application pre-dated January 4th. The cards were never signed, however.
 
 
 17
 Upon the facts the Board found that Jan Power of M & M violated Section 8(a) (1) of the National Labor Relations Act by threatening and coercively interrogating their employees with respect to the employees' activities on behalf of Local 399; that Jan Power violated Section 8(a)(1) of the Act by creating the impression that its employees' activities on behalf of Local 399 were under surveillance; and that Jan Power also violated Section 8(a)(3) and (1) of the Act by reducing the work hours of employees James and Hayward Ferguson because of their activities on behalf of Local 399. The Board further found that both Jan Power and M & M violated Section 8(a)(2) and (1) of the Act by soliciting membership applications and checkoff authorizations on behalf of Local 986. It also concluded that Jan Power, M & M, and respondent Service Employers Council, acting as the bargaining representative of an employer group composed of Jan Power, M & M, City Building Maintenance Co., Crystal Building Maintenance Co., and Western Management Co., violated Section 8(a)(2) and (1) of the Act by executing, maintaining and enforcing a collective bargaining agreement, including a union security clause, with Local 986 as the representative of the employees of those companies in a multi-employer unit at a time when it did not represent a free and uncoerced majority of the employees. Finally, Local 986 was found to have violated Section 8(a)(1)(A) and (2) of the Act by accepting the recognition and acting as the exclusive bargaining representative of the employees in question without first having obtained authorization from an uncoerced majority.
 
 
 18
 The Board adopted the Trial Examiner's findings that Jan Power and M & M committed violations of Section 8(a)(1), (2) and held that 'particularly in the absence of exceptions we agree' with the trial examiner's findings.
 
 
 19
 As a general rule, this Court is precluded from reviewing these specific findings because the respondents failed to file exceptions with the Board required by 10(e) of the Act and the Board's rule 102.46(h). N.L.R.B. v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); Geauga Plastics Company v. N.L.R.B., 404 F.2d 1382 (C.A. 6, 1968); N.L.R.B. v. Seine and Line Fishermen's Union of San Pedro, 374 F.2d 974, 979 (C.A. 9, 1967). There are no extraordinary circumstances here that would excuse the failure of respondents to file exceptions. See Geauga Plastics Co. v. N.L.R.B., supra, 404 F.2d 1383.
 
 
 20
 The first question in issue is whether the Boare erred in finding that the Local 986 majority was not free and uncoerced so that the collective bargaining agreement between the Council and the Union should have been set aside by the Board. Respondent contends that the Board committed error in its inference based on Clement Bros. Co., 165 N.L.R.B. No. 87 (1967) (Board opinion enforced, 407 F.2d 1027 (C.A. 5, 1969)) that because there was substantial post-agreement misconduct, 'it is more likely that 'the coercion taking place before the contract was executed was substantially more widespread than appears".
 
 
 21
 In the Clement Brothers case the Board was asked to decide whether a union represented an uncoerced majority of employees at the time of recognition or at the time the contract with the employer was executed.
 
 
 22
 The Clement trial examiner found that the Union had 129 signed authorization cards in a unit of roughly the same number of workers; that before the collective bargaining agreement was signed only seven of these cards had been obtained through coercive tactics. Accordingly, the trial examiner held that the coercion was not 'so pervasive' as to 'wholly taint' the majority status of the union.
 
 
 23
 As in the instant case, the Board disagreed with the trial examiner. In our case the Board's decision contains the following:
 
 
 24
 'In Clement Brothers Company, Inc., 165 NLRB No. 87, the Board viewed the question of whether a union's precontract majority had been tainted by coercion as not 'susceptible to resolution by a simple mathematical formula', but rather that 'the character of the coercion should be more realistically measured in terms of its pervasive effect".
 
 
 25
 In marked contrast the Trial Examiner wrote: '* * * as I read the Clement decision, it holds only that given evidence of more than minimal pre-contract misconduct by an employer, it may realistically be inferred that his precontract misconduct was more substantial than appears and was sufficiently widespread to create a reasonable doubt as to the uncoerced character of the majority. I do not interpret Clement as laying down a similar rule where, as in the case of Jan Power and M & M, the pre-contract misconduct of each was only minimal.'
 
 
 26
 For purposes of our decision it is significant to note that the trial examiner considered the misconduct of each of the five contracting employers separately. In his decision the examiner stated:
 
 
 27
 'Under the theories of the General Counsel and the Charging Party, the misconduct of each employer would not be considered separately. 'I reject the contention that the misconduct shown by the record should be aggregated for purposes of determining whether it tainted Local 986's majority.'
 
 
 28
 As between the Board and its Examiner, the crux of the disagreement appears to be this: can evidence of Western's improper solicitation of authorization cards on behalf of Local 986 be used to show that the union majority was tainted?
 
 
 29
 For reasons set out in this opinion, we agree with the position taken by the Board in the instant case.
 
 
 30
 We turn to the issues of this case: (1) Is the Clement Bros. doctrine applicable to this case? (2) If so, is the Clement-type inference proper and reasonable, as a general rule? (3) If proper, was it correct to apply the inference that Local 986's majority was so tainted that it did not represent an uncoerced majority?
 
 
 31
 We answer all of these in the affirmative.
 
 
 32
 As to the first question, the respondent argues that had the Board not aggregated the conduct of all five employers, there would have been 'only minimal pre-Agreement misdconduct, i.e. if the misconduct of Western is not added to that of the members of the Council * * *' so that the Clement Bros. inference would not have been operative.
 
 
 33
 The record before us amply supports the Board's finding that, although Western was not a formal member of the Council, it was part of the multi-employer unit.[1]
 
 
 34
 Conceding that all five employers executed counterparts of the same agreement the respondent contends that because there was no evidence offered that the other employers were aware of Western's misconduct, they should not be held responsible for it. Omaha Neon Sign Co., 170 N.L.R.B. No. 150 (1968) is cited in support.
 
 
 35
 In the Omaha case the Board found that prior to acquisition by another company, Omaha Neon had joined with other employers in negotiating with a Painters Union, and that each employer had signed an identical contract. The Board noted, however, that 'these contracts did not reveal on their face that they were the result of multi-employer bargaining * * *' so that the purchasing company was not informed of Omaha's status as a member of a multi-employer group.
 
 
 36
 In contrast, the record before us is clear that all members of the Council were aware of Western's participation because the Council's Administrator, Mr. Chubb, and'* * * representatives of some of the employers checked Local 986's authorization cards against payroll records of all five companies, and that following that card check, Mr. Chubb recognized Local 986 as the collective bargaining representative of all five companies'.
 
 
 37
 A fortiori, even if none of the Council members was aware of Western's participation, the result would not be different in view of the Supreme Court's admonition that 'We find nothing in the statutory language prescribing scienter as an element of the unfair labor practices are involved. The act made unlawful * * * is employer support of a minority union. Here that support is an accomplished fact.' International Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 739, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1960).
 
 
 38
 It was proper for the Board to consider the abundant evidence of Western's misconduct in determining whether in fact an uncoerced majority existed.
 
 
 39
 Next, respondent argues that 'even assuming the relevance to this case of the inference that there was greater pre-Agreement misconduct than was adduced, the inference is invalid'.
 
 
 40
 In the main, respondent contends that the Board has relied on 'mere speculation' (Morrison-Knudsen v. N.L.R.B., 276 F.2d 63, 73 (C.A. 9, 1960)) and the 'specious inference that because an act or series of acts occurred at an earlier time it follows that, under similar circumstances, they will again occur'. (Dubin-Haskell Lining Corp. v. N.L.R.B., 4 Cir., 375 F.2d 568, 573 (1967)).
 
 
 41
 The Clement inference is based on more than speculation and specious reasoning. Remembering that this Court must sustain the Board's conclusions if they are rational and reasonably inferable from the evidence,[2] the Clement inference clearly qualifies and is not 'mere speculation'.
 
 
 42
 In 1940 the Supreme Court in two cases displayed a marked sensitivity to those elements of coercion that often constitute an unair labor practice.
 
 
 43
 The Court in International Ass'n of Machinists etc. v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940) held that the existence of employer interferences '* * * must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible'.
 
 
 44
 In N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1940) the Court noted at length:
 
 
 45
 'It would indeed be a rare case where the finders of fact could probe the precise factors of motivation which underlay each employee's choice. Normally, the conclusion that their choice was restrained by the employer's interference must of necessity be based on the existence of conditions or circumstances which the employer created or for which he was fairly responsible and as a result of which it may reasonably be inferred that the employees did not have that complete and unfettered freedom of choice which the Act contemplates.'
 
 
 46
 Accordingly, the Board did not err in finding that Local 986's majority was tainted so that the majority was not uncoerced. As a consequence it follows that the Board made a proper finding that the Agreement be set aside.
 
 
 47
 Respondent contends that even though this Court may find that the Agreement was properly set aside, the 'Board's proposed remedy' is defective. This is described by respondent as 'reimbursement to all employees-- those of the respondent employers as well as those of the non-respondents-- of all dues which they have paid'. This is wholly incorrect on the facts in the record. The Board did not order a general dues reimbursement. It did order reimbursement to certain named individuals found to have been coerced and also to those employees 'who joined Respondent Local 986 subsequent to the execution of the unlawful union-security agreement * * *'.
 
 
 48
 It is claimed by respondent that 'only those who had actually been coerced were required to be reimbursed'. This Court's decision in Morrison-Knudsen Co. v. NLRB, 276 F.2d 63 (9 Cir. 1960) is cited in support.
 
 
 49
 In the Morrison-Knudsen case the opinion referred to the Supreme Court's warning in Republic Steel v. NLRB, 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6 (1939) that the Board did not have 'a virtually unlimited discretion to devise punitive measures' and found that the proposed remedial order was penal in character. In that case five identified men were coerced by the employer into joining a union as a condition of hiring. No other evidence was adduced as to coercion practiced on any other identified or identifiable union members. Nevertheless, the Board ordered a refund of all fees and dues to all present and past employees hired for work by the employer at a particular jobsite. This was held to be improper because (in the words of the Court):
 
 
 50
 'Unlike the case of the five students, no other identifiable union members who worked on the job can be shown to have been in any manner coerced in joining the union. No effort was made even to show when these men joined the union. Practically all of them may have belonged for years.'
 
 
 51
 In contrast, the Board's order in our case specifies that a money refund is to be made to certain identified persons and to those union members who are identifiable by reason of their joining the union after the execution of the Agreement.[3]
 
 
 52
 As to those who did join after the execution of the Agreement, it may be argued that the Board could have excluded those employees who voluntarily joined. Though the Board could have done so, it was not required to follow this course in the circumstances of this case.
 
 
 53
 A similar question arose in N.L.R.B. v. Revere Metal Art Co., 280 F.2d 96 (1960) in which there was substantial evidence that a majority of the employees had been coerced into joining a union. There the Second Circuit held that:
 
 
 54
 'though the Board might have excluded the employees who voluntarily signed union cards * * * from the reimbursement provision, it did not abuse its discretion in not doing so since these employees may well have remained in the union only because of the status it had unlawfully acquired. For the courts to require a determination of the attitude of each employee in every case would impose impossible administrative burdens'.
 
 
 55
 Similarly in the instant case we hold it reasonable for the Board to infer that those employees who joined the union after the execution of the agreement could well have been motivated by the overriding compulsion of that agreement and its union-security clause. See also N.L.R.B. v. Gaynor News Co., 2 Cir., 197 F.2d 719 (1952), aff. sub nom. Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, 41 A.L.R.2d 621 (1954).
 
 
 56
 The Order of the Board will be enforced in full.
 
 
 
 *
 Honorable William M. Byrne, United States Senior District Judge, Central District of California, sitting by designation
 
 
 [1]
 In the Council's multi-employer agreement Western was specifically included as an employer; it signed a separate agreement that made specific reference to the other employers and indicated that all the copies should be treated as one agreement. From late December, 1966, until the new agreement was signed on January 15, 1967, Western acted in common interest with the formal members of the Council
 Accordingly, we find that there was substantial evidence for the Board to conclude that Western intended to be bound by group action within the meaning of a multi-employer unit. See NLRB v. S.W. Colo. Ctrs., 10 Cir., 379 F.2d 360, 364 (1967); NLRB v. Dover Tavern Owners' Ass'n., 3 Cir., 412 F.2d 725 (1969).
 
 
 [2]
 NLRB v. So. Bell Tel. & Tel., 319 U.S. 50, 63 S.Ct. 905, 87 L.Ed. 1250 (1943). See also cases in Department Store Food Corp. of Pennsylvania v. NLRB, 3 Cir., 415 F.2d 74, 77 (1969)
 
 
 [3]
 This is basically the same approach taken by the Board in Lunadri-Central Distributing Co., 161 NLRB 1443 (1966)