481 F.2d 996
 83 L.R.R.M. (BNA) 2849, 71 Lab.Cas. P 13,820
 AMALGAMATED LOCAL UNION 355, Petitioner and Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner.
LOCAL 259, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 703-705, Docket 72-1926, 72-2224, 72-2315.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 14, 1973.
Decided July 9, 1973.
 
 Harold Dublirer, New York City (Dublirer, Haydon & Straci, New York City, of counsel), for Amalgamated Local Union 355.
 Leonard Leibowitz, New York City (Richard Dorn, and Sipser, Weinstock, Harper & Dorn, New York City, of counsel), for Local 259, United Automobile Aerospace and Agricultural Implement Workers of America.
 Douglas S. McDowell, Washington, D. C. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., National Labor Relations Board, Washington, D. C., of counsel), for National Labor Relations Board.
 Before FRIENDLY and OAKES, Circuit Judges, and DAVIS, Judge.*
 DAVIS, Judge:
 
 
 1
 Presented for review is a decision and order of the National Labor Relations Board determining that Amalgamated Local Union 355[1] violated section 8(b)(1)(A) and (2) of the National Labor Relations Act, 29 U.S.C. 151 et seq. (1970), by using the aid of Russell Motors, Inc. in organizing that company's employees, by entering into a contract with the company at a time when Local 355 did not represent an uncoerced majority of the employees and when there was a real question as to representation raised by Local 259 of the United Automobile, Aerospace, and Agricultural Implement Workers of America, and by including in the contract and enforcing a union security clause requiring membership in Local 355 as a condition of employment. 198 NLRB No. 58 (July 21, 1972). The Board seeks affirmance and enforcement of the order as it stands.[2] Local 355 attacks its factual foundation, as well as four of the remedial provisions. Local 259 asserts that the Board fell short of providing an adequate remedy. We first take up Local 355's challenge to the agency's findings and determination, and then consider the scope of the remedy.
 
 I.
 
 2
 Russell Motors is a New York corporation located in the village of Roslyn, Nassau County. Operating out of two separate facilities, the company retails and services new and used Buicks and Opels. There are separate sales and service departments, the latter having four subdivisions: the repair shop, the parts department, the body shop and the "make ready" shop (where optional equipment is installed and the car cleaned prior to delivery to the customer). In the fall of 1970, there were about 25 employees in the service department, if supervisory staff members are counted in the total.[3]
 
 
 3
 At that time, an organizing campaign of the service department was conducted on behalf of Local 355, and Russell entered into a contract with that union. During the same period, Local 259 also acquired a sufficient number of authorization cards from employees to demand recognition.[4] The trier found, and the Board agreed, that Russell's "announced preference of Local 355, its open membership campaign at its own expense through its own supervisors and management-related personnel on behalf of Local 355, its deliberate misdating of the 'collective agreement' hastily executed with Local 355, the terms and provisions of that 'collective agreement' including the mandatory Local 355 membership and dues 'checkoff' with surrender of the right to strike and other employee rights, and its threats to shut down rather than deal with UAW Local 259 speak eloquently of a snug 'sweetheart' arrangement as charged" [footnotes omitted]. 198 N.L.R.B. No. 58, at 46.
 
 
 4
 Supervisory employees: Local 355 complains that, in coming to this conclusion, the Board characterized too many of Russell's employees as supervisors, given the size and organization of the service department. Section 2(11) of the Act defines a "supervisor" as:
 
 
 5
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. [29 U.S.C. Sec. 152(11) (1970).]
 
 
 6
 It is well settled that this section is to be read in the disjunctive; any of the listed elements is sufficient for an initial finding of supervisory status. N.L. R.B. v. Metropolitan Life Ins. Co., 405 F.2d 1169, 1173 (C.A. 2, 1968); Warner Co. v. N.L.R.B., 365 F.2d 435, 437 (C.A. 3, 1966); N.L.R.B. v. Elliott-Williams Co., 345 F.2d 460, 463 (C.A. 7, 1965); N.L.R.B. v. City Yellow Cab Co., 344 F.2d 575, 580 (CA. 6, 1965); N.L. R.B. v. Quincy Steel Casting Co., 200 F. 2d 293, 295 (C.A. 1, 1952). It has also been held that the Board's findings in this area are entitled to special weight since it possesses expertise "in evaluating actual power distributions which exist within an enterprise" needed for drawing lines between managerial personnel and the rank and file. N.L.R.B. v. Metropolitan Life Ins. Co., supra, 405 F.2d at 1172; see Marine Eng'rs Beneficial Assn. v. Interlake S.S. Co., 370 U. S. 173, 179 n.6, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962).
 
 
 7
 There is no question that Russell Philpit, the president of Russell Motors, Joseph Nocella, the service manager, and James Guido, the assistant service manager, all were properly taken by the Board to be supervisors. As to the controverted status of the people in charge of the service department subdivisions, we conclude that Orval Marquand, George Guido, and Henry Mack-who were significantly connected with the giving of the unlawful assistance-were all permissibly characterized, in connection with the finding on that point, as supervisory personnel.
 
 
 8
 Marquand was manager of the parts department. On a salary plus commission basis, he had the power effectively to recommend people for hiring. He did not punch a timeclock, unlike at least one of his two regular subordinates. Local 355 insists that, with only two employees under him, Marquand could not really be considered a supervisor. It is, however, the capability of control rather than the number controlled that is decisive. Mack was foreman of the body shop. Although he worked on cars just like the other three men in that shop, he had the power to direct their work. He could decide whether the shop should accept a particular job at a particular time and could schedule work. He could also make effective recommendations for hiring, promotions, and the granting of overtime. He was the only worker in the shop not required to punch the timeclock and the only one to receive commissions in addition to his salary. George Guido, James' brother, was foreman or manager of the make-ready shop. He assigned and scheduled work among the three other workers in his shop, doing none of the physical labor himself. Paid on straight salary, he did not punch a timeclock while the men under him did.
 
 
 9
 In the light of these facts, the Board's conclusion as to the supervisory status of each of these men must be upheld. As we point out below, the Board could find that the other employees reasonably believed these men to be acting in the employer's interest.
 
 
 10
 Local 355's membership drive: There is ample evidence to support the Board's view that supervisors participated importantly, on behalf of the employer, in obtaining signed cards authorizing Local 355 as the collective bargaining representative and also that the rank-and-file could reasonably think of these supervisory personnel as reflecting management's position.
 
 
 11
 In 1970, signs of employee dissatisfaction with the company's existing hospitalization benefits had begun to appear; a series of discussions was held among the employees about the possibility of unionization. At this stage, there was no specific mention of any particular union. During one of the meetings, Richard Nocella, a mechanic in the repair shop and brother of Joseph Nocella (the service manager), volunteered to get in touch with a friend of his already in a union.[5] Nocella then contacted, via this friend, Henry Stirt, business agent and treasurer for Local 355, and arranged for a meeting with him.[6]
 
 
 12
 On September 8, Stirt came to Russell Motors during working hours and, in the course of a meeting with Nocella (and Marquand) in his car, handed over a substantial number of Local 355 employee authorization cards. Stirt was aware that Marquand was the parts manager but concluded that he was a supervisor in title only. In any event, cards were turned over by Stirt and Marquand ended up with three of them -one for himself and the remaining two for the other men in the parts department. He was given the cards either directly by Stirt, as Marquand testified, or from Nocella later on, as Nocella remembered it.
 
 
 13
 Henry Mack, foreman of the body shop, received a call from Richard Nocella, telling him that cards were going to be sent over to his shop; they arrived the same day. Mack told the employees in the body and make-ready shops, during working hours, that Nocella had sent the cards over. Mack said that the cards were on his desk and once they were signed he would get them back to Nocella. Mack did not personally hand the cards out but left them on the desk for the men to pick up. He reminded the men, later on, that the cards were there and asked if they had filled them out yet. He offered the comment that Local 355 was a good union. Mack told one of the workers in the body shop that if the latter wished to join the union with the majority of them, he should sign a card. The reply was that the employee "would go with the majority." The cards were on Mack's desk overnight and a number of men remembered returning their cards the next day. Most cards were put back on the desk and then sent, including one for Mack himself, back to Richard Nocella.
 
 
 14
 It is not completely certain that Marquand, manager of the parts department, helped to distribute any cards. Although he was given some for his subordinates, James Walker remembers receiving his card from Richard Nocella, signing and returning it to Nocella. Marquand recalls giving a card to Walker and to the other parts department employee (who never signed his).
 
 
 15
 Joseph Nocella, the service manager, also took part in the distribution of cards. Mark Kennedy, a porter, testified that he was given cards by Joseph Nocella and returned them to Nocella's desk as instructed. Richard Walker, the repair shop working foreman, said that he too received his card from the service manager-in the latter's office and in the presence of Richard Nocella-during working hours. With a pile of cards sitting on the desk, both Nocellas, according to Walker, said they were bringing in the union. When Walker protested that he, as shop foreman, probably should not sign a card, Joseph Nocella told him that everyone was going to have cards. Walker signed later that day and returned the card to Richard Nocella.[7]
 
 
 16
 All this is adequate support for a finding of Joseph Nocella's direct involvement in the card distribution, but in any event it is certain that he was aware of the activity. James Guido confronted Joseph Nocella about his brother Richard's activity (the handing out of cards), but was told by Nocella that the company had adopted a hands off policy, that "[i]f they want a union, it's perfectly all right." According to Joseph Nocella, "nobody, no part of management in any manner, shape or form . . . was to interfere." He did not subsequently speak to his brother, Mack, or Marquand about the distribution of the cards. Joseph Nocella did inform president Philpit about his brother's distribution of cards, but Philpit did nothing.
 
 
 17
 While there was no posted company rule concerning solicitation on company time, it was company practice to prohibit such activities during working hours. Joseph Nocella had previously warned the men generally not to pass out union cards on company time. The administrative law judge permissibly found that Philpit's admitted failure, on this occasion, to tell the service manager (J. Nocella) to warn the latter's brother to desist from distribution was "strongly consistent with the desire if not intention of raising no impediment to Russell employees being exclusively 'represented' by Local 355." More generally, the Board could find that the cards for Local 355 were openly distributed, and the employees were openly solicited to sign and join "almost entirely during paid working time, not only without objection or interference but in many cases with the active encouragement, support, and even participation of Russell supervisory personnel." This attitude and activity, especially when contrasted with the treatment of Local 259, see infra, supports the finding that Local 355 was an assisted union.[8]
 
 
 18
 Negotiation and adoption of the contract: There is further evidence of assistance in the events surrounding the negotiation and execution of the contract with Local 355 as part of the apparent effort to bar Local 259. In the Board proceedings, the management side depicted a rapid sequence of occurrences that culminated with the signing of the contract on September 10, four days before the arrival of Local 259 on the scene. According to the testimony of Richard Nocella and Henry Stirt (Local 355 agent), immediately after the meeting with Stirt in a car on September 8th, Stirt went into the building and talked with a group of employees during lunch about the union and its benefits. Richard Nocella supposedly began to hand out the authorization cards that afternoon, on September 8. While he may have handed out more on September 9, he had most of the cards back on the 9th and called Stirt that day, arranging for a meeting at a local restaurant at noon with an employee negotiating committee. At the conclusion of the luncheon meeting, Stirt supposedly went directly to see president Philpit alone, gave Philpit the authorization cards, and, after some discussion, left a form contract with him. The next day, September 10, Philpit and Stirt allegedly signed the formal contract in the presence of Joseph Nocella. Later that day, Stirt testified that he contacted Richard Nocella to tell him of the contract signing and to arrange for a meeting of employees on September 14.
 
 
 19
 But the fact-finders could discount this version in the face of other testimony which indicated that the crucial events took place after, not before, Local 259 first became involved. The latter event may have occurred as early as September 8th, or as late as September 11th.[9] The important aspect is, however, that the record contains solid ground for concluding that the company's signing of the contract with Local 355 did not occur until after September 11th.
 
 
 20
 In the actual negotiations with Local 355, the first critical step was the luncheon meeting between Stirt of the union and an employee negotiating committee which it is claimed took place on September 9th. The committee, picked by Richard Nocella, consisted of Nocella, Marquand, George Guido, and Henry Mack, three supervisors out of four members.[10] There is general agreement that, at the lunch, Stirt described Local 355's prevailing rates and benefits, some discussion followed, but there was no final agreement. Nocella, upon returning, told Joe Renaldo, a mechanic,[11] the wage figures for each employee but did not say that a contract had been signed. Nocella reportedly stated that he might be able to get better figures. Nocella also told another mechanic essentially the same thing, again without mentioning a contract signing. Marquand did not recall Stirt's telling at the meeting of a signed contract; he testified that "[i]f the contract had been signed, there wouldn't have been any reason to have a meeting." Most of the witnesses disagreed with Stirt's testimony that the meeting took place on September 9. George Guido placed the luncheon after the meeting of Local 259 on September 14. Renaldo remembered being asked to attend after he signed his card for Local 259 on September 14. Marquand testified that the meeting took place a day or two after he signed the cards for Local 355, i. e. September 10 or 11. Henry Mack thought that he attended after the Local 259 meeting of the 14th.[12] Richard Nocella began his testimony by placing the meeting on September 9, but ultimately was unable to remember the date, even whether it occurred before or after the Local 259 meeting.
 
 
 21
 On this testimony it is plain that the Board was free to decide that the meeting with Local 355 did not occur on September 9 as Henry Stirt said. This conclusion in turn severely undermines the possibility that the contract was signed, as claimed, on September 10.
 
 
 22
 There is, in addition, considerable circumstantial support for the agency's determination that, in all probability, the contract was actually signed on September 15th or later. Three meetings appear to have occurred on the 14th. At one, Stirt talked to a group of employees about various benefits and there is testimony that he acted as if negotiations were still in process and did not mention a signed contract. Stirt held another such meeting on the evening of the 14th; the bulk of the testimony suggests that on that occasion, too, he never mentioned a consummated contract, phrasing his statements in terms of what Local 355 members usually received; he also described certain wage classifications that did not conform with those in the contract now argued to have been already signed on September 10th.
 
 
 23
 Ralph Diamond of Local 259 held his own discussion with the same group of men after Stirt's evening meeting on the 14th. He talked about the wages and benefits of both unions and handed out authorization cards for Local 259 (receiving back 16 or 17 signed cards). Richard Nocella attended but never mentioned that a contract with Local 355 had been signed. Diamond asked whether there had been such a signing and was told there had not, but that a negotiating committee had been formed and was scheduled to meet with president Philpit the next day, September 15, for the first time. At the conclusion of the meeting, Diamond went to see Joseph Nocella (Philpit was not available) and demanded recognition of Local 259. When this was denied, Diamond sent a telegram to Philpit to reiterate that demand and to ask that the status quo be maintained and all negotiations with Local 355 cease until a Board election.
 
 
 24
 Another significant fragment of the mosaic is that, after the formal intervention of Local 259, president Philpit, again without mentioning a signed contract, upbraided George Guido for getting in touch with Local 259 (although he never protested to the supervisory personnel who aided Local 355) and said that he would not sign with 259 but would rather sell his business. This latter observation was repeated by Joseph Nocella, on September 16th, to a group of employees; Nocella indicated that he and Philpit both wanted Local 355.[13] A number of employees talked in support of the Local 259 plan, but then Richard Nocella said that it would probably require a strike to get the latter in. The other men did not think it worth a strike.
 
 
 25
 By Friday, September 18, the contract definitely had been signed. Stirt told employee Guttilla as much on that day. Stirt also told him that the pay would be retroactive to September 10. Pay checks were handed out to the employees on September 18, covering the period September 10-16. Local 355 has argued that, since those checks showed increases for most if not all of the employees, the payroll records support a conclusion that the contract was in fact signed on the 10th. But, as the Board noted, there is no way to ascertain what date the payroll records were made up; there is the strong likelihood that, as Guttilla testified, the pay increases were retroactive to September 10.
 
 
 26
 The inability to isolate the exact date of signing does not affect the validity of the findings of the Administrative Law Judge and the Board. There is, we think it clear, substantial evidence that the contract was executed on or after September 15 (post arrival of Local 259) and either backdated or signed without changing the previously typed date of September 10. As the Board said, it is most unlikely that the employer would not inform its own supervisors that it had executed a contract and unlikely that Local 355 would not likewise promptly publicize a signing, especially in light of the activities of Local 259. Yet even at the most logical and appropriate moments, i. e., at the group meetings, there was no clear statement by Philpit, Stirt, or either of the Nocellas that a contract existed. In contrast, their statements, on the whole, were phrased in terms of future negotiations and a potential agreement.
 
 
 27
 The Administrative Law Judge weighed not only the number of witnesses testifying to a particular version of events, but also their credibility. He found the evidence of Joseph Nocella, Philpit, and Henry Stirt filled with inconsistencies (both internally and among themselves), hedging, evasiveness, and alleged memory lapses, and susceptible to disbelief. Most of the other witnesses he found to be reliable, impressive, credible and consistent. This court has said on a number of occasions that "questions of credibility are for the trier of fact and that we will not upset the decision of the Board 'when it accepts a finding of an Examiner which is grounded upon (a) his disbelief in an orally testifying witness' testimony because of the witness' demeanor or (b) the Examiner's evaluation of oral testimony as reliable, unless on its face it is hopelessly incredible * * *."' N. L. R. B. v. Warrensburg Board & Paper Corp., 340 F.2d 920, 922 (C.A.2, 1965); accord, N. L. R. B. v. Marsellus Vault & Sales, Inc., 431 F.2d 933, 937 (C.A.2, 1970); N. L. R. B. v. A & S Electronic Die Corp., 423 F.2d 218, 220 (C.A.2), cert. denied, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 65 (1970). We have studied this record carefully, and in light of the administrative law judge's conscientious effort to describe the factors that led him to credit some witnesses and discredit others, we can conclude that the administrative law judge's evaluation is entitled to full respect.
 
 
 28
 The contract terms: The contract itself provides additional evidence of coercion and a speedy effort to thwart the entry of Local 259. All service employees were required to join and maintain membership in good standing in Local 355. During the life of the agreement, there was to be "no strike, stoppage of work, slow down, picketing, boycotting, lockout, or any other economic pressure or activity of any kind by either party against the other * * *." There was a mandatory dues checkoff deduction from pay. The agreement automatically renewed itself from year to year unless formally renounced by one of the parties. Also, the document was incomplete in that the wage schedule appendix did not specify the wages for all of the employees, and company officials were orally included in the welfare plan, rather than by writing -emphasizing the haste of execution.[14] As the Administrative Law Judge concluded, the text demonstrated that "whenever the contract was signed, the parties had not yet fully negotiated its terms or the terms which are normally to be found in a bona-fide collective agreement resulting from arms'-length dealing." 198 N.L.R.B. No. 58, at 37, n. 63.[15]
 
 
 29
 In sum, it is plain, on the whole record, that the Board could rightfully conclude that the Russell management improperly made its agreement with Local 355 "in an attempt to insure that its employees would be exclusively 'represented' by Local 355 and to forestall (1) its employees' being represented by UAW Local 259 or any labor organization of their own free choice, (2) the necessity for Russell to recognize, deal or negotiate with UAW Local 259 or any labor organization of Russell's employees' own free choice, and (3) a Board-conducted election to determine by official secret ballot its employees' true representational desires." The execution of a contract in the face of the rival claim of Local 259 and the real question of representation that then existed amounts to a violation of the Act. Midwest Piping & Supply Co., 63 N.L.R.B., 1060 (1945); accord, Empire State Sugar Co. v. N. L. R. B., 401 F.2d 559, 562 (C.A.2, 1968); N. L. R. B. v. National Container Corp., 211 F.2d 525, 536 (C. A.2, 1954). By being a party to such a contract, Local 355 has infringed section 8(b)(1)(A). See I. L. G. W. U. v. N. L. R. B., 366 U.S. 731, 738, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); N. L. R. B. v. Raymond Buick, Inc., 445 F.2d 644 (C.A.2, 1971 (involving Local 355).
 
 II.
 
 30
 To redress these violations, the Board ordered Local 355 (a) to cease and desist from acting as the collective bargaining representative of the company's employees unless and until certified, as well as from giving effect to the collective bargaining agreement and the checkoff provisions of the authorization cards; (b) to reimburse (together with the employer) present and former employees for all initiation fees, dues, and other moneys collected on behalf of Local 355 pursuant to the union-security and checkoff authorizations; (c) to cease and desist from causing or attempting to cause an employer to discriminate against an employee in violation of section 8(a)(3) of the Act, or from restraining or coercing, in any other manner, any employee in the exercise of statutory rights; and (d) to post stated compliance notices. Both Local 259 and Local 355 challenge the order, the former as too restricted, the latter as too broad.
 
 
 31
 A. Local 259 asks us to modify and expand the order by (1) designating interest at the maximum lawful New York rate, instead of the standard six percent, (2) requiring Russell Motors and Local 355 to reimburse Local 259 for attorneys' fees and other litigation expenses; (3) ordering the company and the rival union to reimburse Local 259 for its organizational expenses incurred in connection with the service employees of Russell Motors on and since September 14, 1970; (4) requiring Local 355 to cease for three years from representing any employees (not already validly represented by it) unless and until it shall be duly certified by the Board following a Board-conducted election; (5) requiring Local 355 to cease issuing to any employer or employee any authorization or membership application cards unless they contain statements that the Board had found the union guilty of collusion with employers to violate the rights of employees and also that the union had been adjudged in contempt of court; (6) requiring Local 355 to mail a copy of the required notice to each of its members; and (7) compelling the union to cease utilizing officials, supervisors, or agents of any employer to organize such employer's employees. These provisions were all recommended by the administrative law judge but rejected by the Board.
 
 
 32
 There is no need to ring the changes on the agency's broad discretion in the selection of remedies, and the deference paid by reviewing courts when such choices have been deliberately and rationally made. That much is now engrained in Board law. See, e. g. N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Lipman Motors, Inc. v. N. L. R. B., 451 F.2d 823, 828-829 (C.A.2, 1971); The Herald Company v. N. L. R. B., 444 F.2d 430, 435-437 (C.A.2, 1971), cert. denied, 404 U.S. 990, 92 S.Ct. 532, 30 L.Ed.2d 541.
 
 
 33
 In this instance, the Board addressed each of the proposals now pressed by Local 259 and gave acceptable reasons why they should not be adopted. New York's "maximum" interest rate was rejected because "the effective administration of the Act is best served by remedies which, except as otherwise directed by Congress, are uniformly applicable throughout the Board's jurisdiction. That purpose cannot be achieved by tailoring a remedy to fit the laws regarding lawful interest rates of the various States and Territories within our jurisdiction." No provision was made for reimbursement of attorneys' fees and litigation expenses because the respondents' defenses were debatable, not frivolous, and the right to present that kind of substantial defense should not be chilled. Local 259's organizational expenses in September 1970 were denied because they would have been incurred even if Local 355 had not engaged in unfair practices; it is now said that in the future Local 259 will have to expend substantial sums to overcome this unlawful conduct, but possible damages of that consequential type are so uncertain, speculative and indefinite that the Board cannot be faulted for failing to calculate and impose them.
 
 
 34
 The Board also refused to bar Local 355, for three years, from representing any employees unless certified, and to direct the union to show on its authorization cards that it had been found in collusion and adjudged in contempt. The agency felt that these remedies were in effect punitive-the panel specifically indicated that there was no showing that all of the local's 5,000 members in about 275 units were unlawfully organized[16] rather than directed to remedying the particular unfair practices found. The statutory purposes would be better served, the panel believed, "by a broad cease-and-desist order forbidding repetition of similar conduct, which may hereafter be enforced by a court of appeals, thereby subjecting Respondent Local 355 to contempt proceedings in the event it does not comply with such a court order." Similarly, the Board thought it unnecessary to direct Local 355 to cease using employer's officials, supervisors and agents in organizational activities because that conduct was already proscribed by the broad general provisions of the order.
 
 
 35
 We cannot find an abuse of discretion in this disposition of Local 259's requests. The grounds given are all substantial and rational, well within the spectrum of the Board's authority. Local 259 emphasizes what the administrative law judge called 355's "long and consistent history of violations before the Board and Courts for more than 10 years." 198 N.L.R.B. No. 58, at 50.[17] The Board did take account of this parade of transgressions to the extent of expanding somewhat the conventional cease-and-desist requirements, but it felt, for the solid reasons we have summarized, that it was not warranted in going still further. The problem of how drastic to mold the remedy in a particular proceeding concerned with the latest in a series of violations calls for the sensitive exercise of administrative judgment, and we cannot substitute our own opinion for the Board's reasoned explication.
 
 
 36
 The court of appeals' rulings directing the Board to expand, or to consider expanding, its remedies have all involved quite different situations. In Textile Workers Union of America, AFL-CIO v. N. L. R. B., 475 F.2d 973 (C.A.D.C., 1973), the court remanded for further consideration because it felt the agency had failed to explain completely and adequately why the employer's long history of unfair labor practices did not warrant the broader relief the charging union requested; here, on the contrary, a detailed and acceptable explanation has been given. In Int'l Union of Electrical, Radio & Machine Workers, AFL-CIO v. N. L. R. B. (Tiidee Products Inc.), 138 U.S.App.D.C. 249, 426 F.2d 1243, 1248, 1253 (1970), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256, the District of Columbia Circuit found the employer's conduct to be a "clear and flagrant violation of the law" and its defenses "patently frivolous."[18] In contrast, the District of Columbia Circuit has recognized that, where, as here, a respondent's defense requires resolution of conflicting testimony and evaluation of credibility, the defense cannot be deemed frivolous or without merit on its face. United Steelworkers v. N. L. R. B. (Quality Rubber Mfg. Co.), 430 F.2d 519, 521 (C.A.D.C., 1970); Southwest Reg. Joint Bd., Amalgamated Clothing Workers v. N. L. R. B., 142 U.S.App.D. C. 337, 441 F.2d 1027, 1035-1036 (1970); Ex-Cell-O Corp. v. N. L. R. B., 145 U.S. App.D.C. 396, 449 F.2d 1058, 1064 (1971).
 
 
 37
 B. Local 355, for its part, attacks the order in four particulars. Two involve cease-and-desist requirements extending beyond the employees of Russell Motors.[19] In the light of 355's general history, note 17 supra, these broader directives are justifiable; the violations covered by the challenged paragraphs resemble those which occurred in this case and the local's propensity for comparable misconduct against employees generally has been fully established. Cf. N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 422 F.2d 850, 852 (C. A.2, 1970); N. L. R. B. v. Local 25, I.B. E.W., 383 F.2d 449, 454-455 (C.A.2, 1967); N. L. R. B. v. Local 138, 138A, 138B, Int'l Union of Operating Engineers, 377 F.2d 528, 530 (C.A.2, 1963). Once again, the Board's exercise of its administrative discretion and judgment must be accepted as reasonable.
 
 
 38
 The other two of the union's complaints involve the form of the "Notice to Members" it is required to post. After a short summary of the violations the Board found the local to have committed, the notice says: "We [i. e. Local 355] will not do such things again." Comparable phrasing, though perhaps not as abrupt, has been allowed. Love Box Co. v. N. L. R. B., 422 F.2d 232, 235-236 (C.A.10, 1970); Unit Drop Forge, Div. Eaton, Yale & Towne, Inc. v. N. L. R. B., 412 F.2d 108, 111 (C.A.7, 1969); N. L. R. B. v. Douglas & Lomason Co., 443 F.2d 291, 295 (C.A.5, 1971); Spartans Industries v. N. L. R. B., 406 F.2d 1002, 1006 (C.A.5, 1969). Though tart, the challenged sentence is not unfair.
 
 
 39
 The last objection is that the notice compels Local 355 to refer to the agreement with Russell Motors as a "sweetheart contract" and to say that the Board had found it in violation of the Act by entering into a "sweetheart contract" with that company. On this point the court is divided. Judges Friendly and Oakes would delete the words "sweetheart contract" from the notice and substitute "collusive contract". They accept the definition of a "sweetheart contract" in the Random House Dictionary, i. e. a "substandard contract made through collusion between dishonest management and labor representatives to pay low wages to union workers." In their opinion the agreement in this case fails the two tests of dishonesty and substandard wages in that there is insufficient proof either that the employer and the union were dishonest in the normal sense, or that the wage levels inserted in the contract with Local 355 were substantially below the prevailing rates. In addition, these judges consider "sweetheart contract" to be an opprobrious epithet, not to be used unless clearly warranted by the facts. Accordingly, Judges Friendly and Oakes, constituting the majority of the panel, hold that "sweetheart" should be replaced by "collusive".
 
 
 40
 The writer of this opinion, Judge Davis, dissents from this change. He thinks that in the circumstances the Board had the right, at its election, to use the "sweetheart" designation. His understanding of a "sweetheart" contract is that it covers any collusive arrangement between a union and an employer, made for their mutual advantage and without dominant concern on the union's part for the employees' interests; the agreement does not have to be substandard in content but may be made, for example, because the company prefers to deal with the particular union as more pliable, less troublesome, etc. Judge Davis thinks that the Board could find that that occurred in this case. Even if one adopts the Random House definition, Judge Davis also believes that the Board could find the necessary prerequisites in this instance. As he sees it, "dishonest" negotiations do not necessarily imply bribery or larceny, but rather that both management and union acted deceitfully toward the employees, being primarily moved by their mutual (and not the workers') advantage. This record, together with Local 355's previous history, supports such a conclusion here. On the substandard level of the wages, the record is thin and not compelling one way or the other; Local 259's rates appear to be higher in certain respects and were claimed by that union to be "prevailing"; other aspects of the Local 259 "package" also seem more favorable to the employees. In Judge Davis' view, the term "sweetheart" is not so derogatory or demeaning that the Board had to have more convincing proof than was offered and relied upon in this case.
 
 
 41
 The end-result is that the Board's determination and order are affirmed on Local 259's petition for review, and also on Local 355's petition except that the latter's petition is granted to the extent of substituting the words "collusive contract" for "sweetheart contract" in the Notice to Members to be posted by Local 355. The Board's petition to enforce is also granted with this single modification.
 
 
 42
 Order modified in accordance with this opinion and as so modified enforcement granted. Despite the minor modification both the Board and Local 259 may recover costs against Local 355.
 
 
 
 *
 Of the United States Court of Claims, sitting by designation
 
 
 [1]
 Local 355 is an independent union, unaffiliated with a parent organization
 
 
 [2]
 In the same decision and order the Board found the employer, Russell Motors, Inc., in violation of section 8(a)(1), (2), and (3) of the Act. Russell Motors has not sought review but the Board's application for summary enforcement against Russell is pending before this court (No. 72-2346)
 
 
 [3]
 This case concerns attempts to organize only the service department and not the sales staff or clerical help
 
 
 [4]
 Local 259 had represented the Russell service employees before 1970, following an election and official Board certification. After certification, there were charges, a complaint, a Board order, and a court decree against the company for unlawful refusal to bargain with Local 259
 
 
 [5]
 Nocella ultimately became shop steward for Local 355, a position of top seniority according to the terms of the contract
 
 
 [6]
 There is likewise evidence that, as early as these meetings, James Guido, assistant service manager, also offered to look into the problem. Local 259's later involvement was at Guido's invitation. See note 9 infra. The Board was correct in finding that the defendant union in this proceeding is Local 355, not Local 259. The propriety of actions by Guido or Local 259, in the absence of filed charges of misconduct, is irrelevant to the charge against the other union
 
 
 [7]
 Twenty-one of the authorization cards were signed and returned, dated September 9, and a few with other dates. Most were dated by the signers. However, even the cards dated by the signers do not reliably reflect when they were returned to Richard Nocella. A number of men signed and returned their cards on the same day; others who dated their cards September 9 did not return them on the same day as signed. Everything considered, September 9 is the earliest possible date that may be treated as the day on which almost all of the cards were returned signed
 
 
 [8]
 It is unnecessary, in negating a claim of an uncoerced majority, to show mathematically that less than a majority freely signed authorization cards. A pattern of company assistance can be sufficient to invalidate all cards. See N.L.R.B. v. Jan Power, Inc., 421 F.2d 1058, 1061-1062 (C.A.9, 1970); Department Store Food Corp. v. N.L.R.B., 415 F.2d 74, 77 n. 4 (C.A.3, 1969); N.L.R.B. v. James Thompson & Co., 208 F.2d 743, 746-748 (C.A.2, 1953)
 
 
 [9]
 As already indicated, note 6 supra, James Guido, assistant service manager, inquired whether employees wished a union other than Local 355. Receiving some affirmative response, he phoned Ralph Diamond, vice-president of Local 259, telling Diamond that he didn't like what was going on with Local 355; Guido then arranged for Diamond to come to Russell Motors on Monday, September 14th. Guido and Marquand were fairly certain that these events occurred on Friday, September 11. Diamond, however, testified that he received Guido's call on Thursday, September 10th. Hugo Grubel stated that it occurred on the same day he signed his cards, i. e., the 9th. Joseph Nocella thought that Guido told him of his brother's activities possibly on September 8 or 9 but he was not very certain
 
 
 [10]
 The participation of even "minor" supervisors on negotiating committees has been held improper. See Mon River Towing, Inc. v. N.L.R.B., 421 F.2d 1, 7-8 (C.A.3, 1969). Marquand stated that there was no election of the members. Others, however, do remember such an election, placing it on September 14
 
 
 [11]
 Renaldo also was invited to attend the luncheon but refused. He remembered being asked to attend after he had signed his card for Local 259
 
 
 [12]
 Mack thought, however, that a number of meetings occurred that he could not attend and that a contract had been signed by the time of the lunch
 
 
 [13]
 An employer is free to make predictions about the probable effects of unionization on his business, but his predictions must be "carefully phrased on the basis of objective fact" to convey his beliefs about matters beyond his control, or to convey management decisions already arrived at. N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 618-620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). See Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 274 n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); cf. N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); N. L. R. B. v. Virginia Elec. & Power Co., 314 U.S. 469, 477-478, 62 S.Ct. 344, 86 L.Ed. 348 (1941)
 
 
 [14]
 The participation in the welfare fund described in the contract was to include all officials and employees of Russell rather than just those who were members of Local 355. As the agency found, the participation of supervisors in the welfare benefits is not specifically alleged to be in violation of the Act. However, "it smacks of an accommodative element between the Employer and Local 355 suggestive of close relationship and common interest and not the usual arms'-length dealing." 198 N.L.R.B. No. 58, at 39
 
 
 [15]
 The fact that this was the only union agreement concluded by Russell in twenty years can also be taken into account in deciding whether a "suddenly and speedily installed union has achieved such unique 'instant success' as a result of employer assistance." Cf. N .L. R. B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368 (1941)
 
 
 [16]
 The request that the compliance notice be sent to all union members was rejected on the same ground that there was no evidence that these other members had been organized illegally
 
 
 [17]
 The Board counted 14 other cases involving Local 355. The reported court decisions are: N. L. R. B. v. Lundy Mfg. Corp., 316 F.2d 921 (C.A.2), cert. denied, 375 U.S. 895, 84 S.Ct. 171, 11 L.Ed.2d 124 (1963); N. L. R. B. v. Fiore Bros. Oil Co., 317 F.2d 710 (C.A.2, 1963); N. L. R. B. v. Malcolm Konner Chevrolet, Inc., 338 F.2d 972 (C.A.3, 1964); N. L. R. B. v. Raymond Buick, Inc., 445 F.2d 644 (C.A.2, 1971). See also N. L. R. B. v. Amalgamated Local Union 355, 77 LRRM 3082 (C.A.2, July 12, 1971) (civil contempt judgment entered against Local 355)
 
 
 [18]
 The recent decision in Food Store Employees Union Local No. 347, Amalgamated Meat Cutters v. N. L. R. B., 476 F.2d 546 (C.A.D.C., 1973), ordered reimbursement by an employer of legal fees and litigation expenses because the Board itself had characterized the respondent's conduct as "clearly aggravated and pervasive" misconduct, and had questioned the employer's good faith on account of its "flagrant repetition of conduct previously found unlawful" at other of the employer's stores. Although Local 355 has had a long history of violations of the National Labor Relations Act, the Board did not here find a comparable pattern of aggravated repetition of the unfair labor practice of accepting assistance. On the contrary, the Board specifically found Local 355's defenses not to be frivolous and some of them to be "relatively close"
 
 
 [19]
 One paragraph of the order directs the union to "cease and desist from attempting to cause an employer to discriminate against an employee in violation of section 8(a)(3) of the National Labor Relations Act, as amended"; the other orders the local to cease and desist "from in any other manner restraining or coercing any employee in the exercise" of his statutory rights (emphasis added)